VINCENHELLER *v.* REAGAN.

Opinion delivered July 6, 1901.

CONSTITUTIONAL LAW—ACT EMBRACING ONE SUBJECT—OBLIGATION OF CONTRACT.—By resolution of the trustees of the University of Arkansas, the office of vice director and pomologist of the agricultural experiment station was created, and plaintiff was elected thereto for a fixed term at a fixed salary, and accepted the position. Before the term of office expired the legislature, by an act approved May 23, 1901, after making appropriations for the support and maintenance of the University of Arkansas, abolished the office of pomologist, and prohibited the board of trustees from allowing any pay therefor. *Held,* that the act was not repugnant to section 30, art. 5, of the constitution, providing that appropriations shall be by separate bills, each embracing but one subject. *Held,* further, that the act was not unconstitutional as impairing the obligation of a contract, since plaintiff was an officer, and not an employee under contract,

Appeal from Washington Circuit Court.

JOHN N. TILLMAN, Judge.

STATEMENT BY THE COURT.

Appellant filed his petition in the circuit court of Washington county for a mandamus against the appellee, as secretary of the board of trustees of the University of Arkansas, which petition (omitting the style of the court and parties) is as follows:

"The petitioner, W. G. Vincenheller, states that by the act of congress of the United States, approved March 2, 1887, entitled 'An act to establish agricultural experiment stations in connection with the colleges established in the several states under the provisions of the act approved July 2, 1862, and of the acts supplementary thereto,' it is provided 'that in order to aid in acquiring and diffusing among the people of the United States useful and practical information on subjects connected with agriculture, and to promote scientific investigation and experiment respecting the principles and applications of agricultural science, there shall be established, under direction of the college or colleges or agricultural departments of colleges in each state or territory established, or which may hereafter be established, in accordance with the provisions of an act approved July 2, 1862, entitled "An act donating public lands to the several states and territories which may provide colleges for the benefit of agriculture and the mechanic arts," or any of the supplements to said act, a department to be known and designated as an 'agricultural experiment station.'

"Said act of congress specifically designates the object and duty of said experiment station, and then provides:

" 'Section 3. That in order to secure, as far as practicable, uniformity of methods and results in the work of said stations, it shall be the duty of the United States commissioner of agriculture to furnish forms, as far as practicable, for the tabulation of results of investigations or experiments; to indicate, from time to time, such lines of inquiry as to him shall seem most important; and, in general, to furnish such advice and assistance as will best promote the purposes of this act. It shall be the duty of each of said stations, annually, on or before the 1st day of February, to make to the governor of the state or territory in which it is located a full and detailed report of its operations, including a statement of receipts and expenditures, a copy of which report shall be

sent to each of said stations, to the said commissioner of agriculture, and to the secretary of the treasury of the United States.

"'Sec. 5. That, for the purpose of paying the necessary expenses of conducting investigations and experiments and printing and distributing the results as hereinbefore prescribed, the sum of $15,000 per annum is hereby appropriated to each state, to be specifically provided for by congress in the appropriation from year to year, and to each territory entitled under the provisions of section 8 of this act; out of any money in the treasury proceeding from the sales of public lands, to be paid in equal quarterly payments on the 1st day of January, April, July and October in each year, to the treasurer, or other officer duly appointed by the governing boards of said colleges to receive the same, the first payment to be made on the 1st day of October, 1887. * * *

"'Sec. 6. That whenever it shall appear to the secretary of the treasury, from the annual statement of receipts and expenditures of any of said stations, that a portion of the preceding annual appropriation remains unexpended, such amount shall be deducted from the next succeeding annual appropriation to such station, in order that the amount of money appropriated to any station shall not exceed the amount actually and necessarily required for its maintenance and support.

"'Sec. 9. That the grants of money authorized by this act are made subject to the legislative assent of the several states and territories to the purposes of said grants.'

"The appropriation thus made by the said act of congress was accepted by the state of Arkansas by the act of the legislature, approved March 7, 1889, entitled 'An act accepting the provisions of the act of congress establishing agricultural experiment stations,' said act of the legislature expressly providing that 'said appropriation is accepted and assented to in trust for the uses and purposes expressed in said act of congress, and all moneys received by the state under said act of congress shall be and the same are hereby assigned and appropriated for use and disbursement to the Arkansas Industrial University, a college established at Fayetteville in this state, under the provisions of the act of congress approved July 2, 1862.'

"Said appropriations have been made by congress from year to year, as provided by said act of congress of March 2, 1887, and have been paid to the treasurer of the Arkansas Industrial University, now the University of Arkansas, and disbursed by him

upon warrants or orders drawn by the secretary of the board of trustees of said university, for the uses and purposes expressed in said act of congress, under the direction of said board.

"The board of trustees of the University of Arkansas, having, by virtue of said act of congress, the sole control and direction of the said agricultural experiment station, at a regular meeting held on the 8th day of January, 1894, adopted the following resolution:

"'Whereas, the state experiment stations are maintained by the National government and placed under the Arkansas Industrial University department of agriculture for direction and suggestion as to line of work, and it is the approved policy of the United States department of agriculture in all of its scientific investigations to fix the time of office of its employees during good behavior and efficiency; and,

"'Whereas, a longer time than one year is required to plan and complete for publication any useful line of agricultural experimentation, and for the proper continuation of scientific observations, the best interest of the Arkansas agricultural experiment station demands that the station staff be made permanent for a longer period than at present; and,

"'Whereas, the present experiment station staff is efficient and competent, and the experimental work performed and the condition of the experiment station is satisfactory to the farmers of the state; therefore, be it

"'Resolved, That R. L. Bennett, the present director, and present station's staff, be, and they are hereby appointed to their present positions in the experiment station for the term of four years, or during their efficiency and good behavior, subject to removal for cause at any time at the discretion of the board of directors.'

"This policy of the board of trustees was adopted upon the advice of the United States commissioner of agriculture, and has been continued ever since, in accordance with the provisions of the said act of congress establishing agricultural experiment stations, wherein the United States commissioner of agriculture is employed 'to indicate, from time to time, such lines of inquiry as to him shall seem most important; and, in general, to furnish such advice and assistance as will best promote the purposes of the act.' And in furtherance of this policy, upon the recommendation of

said director, R. L. Bennett, the board, at a regular meeting held on the 14th of June, 1889, adopted the following resolution:

"'Resolved, (1) That the office of vice director and pomologist of the agricultural experiment station be and the same is hereby created, and that W. G. Vincenheller be and he is hereby elected to fill said position for the term of four years, ending June 30, 1903, at a salary of $2,000 per annum.

"'(2) That part of the duties of said officer shall be the testing of large fruits, for their quality, adaptation to different soils, acclimation, productiveness, periods of ripening and method of culture.

"'(3) He shall also attend and hold agricultural institutes in different parts of the state.'

"Upon being notified by the secretary of said board of trustees of said action of the board, your petitioner, the said W. G. Vincenheller mentioned in said resolution, at once, in writing, accepted the said place of vice director and pomologist of said agricultural experiment station upon the terms and for the salary mentioned in said resolution, and entered upon the discharge of the duties required of him. These duties he has ever since faithfully performed to the satisfaction of said director, Bennett, and of the said board of trustees, and on the last day of each month, until the month of May just passed, he has regularly received from the defendant Reagan, as secretary of said board, a warrant or order for $166.66, being one-twelfth of the said salary of $2,000, the same being payable monthly as directed by the said board of trustees. But on the 1st day of the present month of June he demanded his usual warrant or order from said defendant for his month's pay, and the same was refused, and is still refused.

"Petitioner further states that the defendant, Hugh F. Reagan, is the secretary of the board of trustees of said University of Arkansas, and, as such secretary has no discretionary powers, but is purely and simply a ministerial officer of said university, created by the laws of the state, and charged with no statutory duties, but acts solely under the direction of the said board of trustees; that he is required to keep a record of the proceedings of said board, and to draw warrants or orders upon the treasurer of said university for the payment to teachers and employees of said university, including the director and his assistants in the agricultural experiment station, of the sums due to each of them, as fixed by said board and appearing upon the records of its proceed-

ings; that said records show that petitioner was employed as vice director and pomologist of said agricultural experiment station in the manner, for the time, and at the salary before mentioned, and that there is now due to him the sum before mentioned for his wages for the month of May just passed, and that the treasurer of said university has money in his hands for payment of the same.

"Your petitioner saith that he has thus far fully performed his part of the contract entered into between the board of trustees of the University of Arkansas and himself as aforesaid, and that he intends continuing to do so for the period of four years, or until the 30th day of June, 1903, as he has agreed to do; that said contract has not been changed, altered, modified or abrogated, and that, without his consent or misconduct, it cannot be; that it is in full force and effect, and that he does not consent to any change in it, nor has he been guilty of any misconduct; that he cannot obtain any part of his salary or compensation without a warrant or order drawn by the defendant, as secretary of the board of trustees aforesaid, upon the treasurer of the University of Arkansas, for the amount due to him; that the sum of $166.66 is now due and owing to him for pay for the month of May just passed; and that he is without remedy, other than the writ of mandamus, to obtain his rights in the premises.

"Wherefore, petitioner prays the court to cause the state's most gracious writ of mandamus to be issued and directed to the defendant, Hugh F. Reagan, as secretary of the board of trustees of the University of Arkansas, commanding him to issue and deliver to the petitioner his warrant or order as such secretary upon the treasurer of said university for the sum of $166.66, being the amount due petitioner for his wages for the month of May, 1901, as vice director and pomologist of the agricultural experiment station aforesaid, and for other relief.

"E. S. McDaniel, Dan W. Jones & Neill, for petitioner."

Appellee filed a general demurrer and an answer to the petition. The answer (omitting the style of the court and parties) is as follows:

"The defendant admits the allegations of fact of the plaintiff's petition, but says that he should not be required to issue the order or warrant therein prayed for, because the general assembly of the state of Arkansas, at its session of 1901, by the act passed by it making appropriations for the University of Arkansas, provided in express terms that the office of pomologist (the same for

the discharge of the duties of which the plaintiff seeks compensation by this procedure) should be, and was thereby, abolished, and the board of trustees prohibited from allowing any pay for same. Defendant therefore prays that the petition be dismissed."

He afterwards filed an amended answer, in which he more specifically answered and admitted the allegations of the plaintiff's petition, but made no defense, other than the act of the legislature of 1901, pleaded in his answer, except that he set up a purported resolution of the board of trustees of June 12, 1896, which was stricken out by the court on appellant's motion.

*E. S. McDaniel* and *Dan W. Jones & Neill,* for appellant.

The act of May 23, 1901, is void: *First,* because the legislature has no power or authority over the subject, it being vested and controlled by act of congress of March 2, 1887. 1 Supp. Rev. Stat. 550-2, §§ 9, 1, 2, 3, 5, 10. *Cf.* Acts of Ark. 1889, p. 32, accepting congressional appropriation. *Second,* because, even if the legislature had power to legislate upon the subject, the provision of the act in question is obnoxious to art. 5, § 21, of the constitution of Arkansas. *Third,* because the constitution forbids that such a provision be made in the general appropriation bill. Const. art. 5, § 30; 13 Mich. 481; 2 Ia. 280; Cooley, Cons'. Lim. 170, 171, 172. *Fourth,* because said act tends to impair the obligation of a contract. Const. U. S. art. 1, § 10; 6 Wall. 385; 2 Black, 96; 100 U. S. 559; 4 Wheat. 694; 103 U. S. 5, 11. Appellant was not a *public officer.* 42 N. Y. Super. 481; Burrill's Law Dict. *"officer;"* 6 Wall. 393; 2 Black, 96; 86 N. Car. 235; 1 Biss. 182; 3 S. & R. 149; 3 Wall. 93. *Fifth,* because the act itself is uncertain, because it applies in terms to only the office of pomologist," and has no application to the "office of vice director and pomologist." The language being plain and unambiguous, there is no room for construction. Endl. Int. Stat. § 24; 66 Ark. 466, 472; 166 U. S. 318. Appellant's proper remedy was mandamus. 43 Ark. 180, 182; High, Ext. Leg. Rem. §§ 100, *et seq.;* Merrill, Mand. § 126; 14 Ark. 687; 42 Ark. 233; 44 Ark. 281.

*Watkins, Walker & Walker,* for appellee.

The legislature had power to regulate and control the subject matter in issue. *Cf.* Sand. & H. Dig., §§ 3401, 3404. The amendment to the general appropriation bill was not prohibited

by the state constitution. Cooley, Const. Lim. 142; 2 Minn. 328; 7 Minn. 468. Nor is the law one tending to impair the obligation of a contract. The position in question was a public office. *Cf.* Sand. & H. Dig., §§ 4067-8-9, 4071-3-4-5-6-7-8-9, 4080-85. The university is a public corporation, and it and its officers are subject to legislative control. 4 Wheat. 518; 47 Mo. 220; Ang. & Ames, Corp. §§ 31-36; 8 Ired. 257; 4 Scam. 190. For definition of "office" see: 52 N. Y. App. 470; Bouv. Dict. *"office;"* and of "public office," see: And. Law Dict. 727; 46 N. Y. App. 375; 52 *ib.* 485. Appellant was a public officer. 63 Am. St. Rep. 723; S. C. 57 Oh. St. 415; 169 Mass. 534; 61 Am. St. Rep. 301. Appellant's position was entirely within the control of the legislature. 2 Beach, Contr. § 1643; Throop, Pub. Off. § 19; 100 U. S. 548; 5 N. Y. 285; 40 Ark. 100; 30 Ark. 566; 61 Ark. 25. Mandamus does not lie. High, Extr. Leg. Rem. p. 12, § 9; *id.* p. 11, §§ 78-9; *id.* p. 119, §§ 115-116; *id.* p. 31, §§ 24, 35; 47 Ark. 85.

BATTLE, J., (after stating the facts). By an act of congress, entitled "An act donating public lands to the several states and territories which may provide colleges for the benefit of agriculture and the mechanic arts," approved July 2, 1862, lands and scrips were donated to the several states, and it was provided that all moneys derived from the sale of such land and scrips "shall be invested in stocks of the United States, or of the states, or in some other safe stocks, yielding not less than five per cent. upon the par value of said stocks; and that the moneys so invested shall constitute a perpetual fund, the capital of which shall remain forever undiminished (except so far as may be provided in section 5 of this act), and the interest of which shall be inviolably appropriated by each state which may take and claim the benefit of this act to the endowment, support and maintenance of at least one college where the leading object shall be, not excluding other scientific and classical studies, and including military tactics, to teach such branches of learning as are related to agriculture and the mechanic arts, in such manner as the legislatures of the states may respectively prescribe, in order to promote the liberal and practical education of the industrial classes in the several pursuits and professions in life." 12 Stat. 503, 504.

In 1867 the state of Arkansas accepted this donation on the terms and conditions in the act provided. In 1871 the general assembly of this state provided for the location and erection of

buildings for a university for the purpose of performing the obligations the state assumed by accepting the donation by congress, and provided that a board of trustees should be elected or appointed for that purpose. The trustees were appointed, and they located the university, and caused the buildings for the same to be erected at the city of Fayetteville, in this state. The means used for that purpose were furnished by the state, assisted by donations secured from the city of Fayetteville and the county of Washington, which were made in consideration of the location of the university at Fayetteville. From this time forward, the university has been an institution of the state, maintained and supported by it. The state, of course, could not control it, except through its agents. Hence a board of trustees was appointed for that purpose by the governor, and they have been vested with the power to prescribe all necessary rules and regulations for the government and discipline of the university, and to prescribe what professors, with the president, shall constitute the faculty, and to fix their compensation, to select its secretary and treasurer, and to do other acts unnecessary to mention. The course of study in the university is prescribed by the statutes, but the board of trustees can add to it. The state has always asserted her right to, and maintained her control over, the university as a state institution, and biennially its affairs have been investigated by a committee appointed by the general assembly for that purpose; and the board of trustees has been merely an agent of the state.

In furtherance of the object of the act of July 2, 1862, congress, by an act entitled "An act to establish agricultural stations in connection with the colleges established in the several states, under the provisions of an act approved July 2, 1862, and the act supplementary thereto," approved March 2, 1887, provided:

"Section 1. That in order to aid in acquiring and diffusing among the people of the United States useful and practical information on subjects connected with agriculture, and to promote scientific investigation and experiment respecting the principles and applications of agricultural science, there shall be established, *under direction* of the college or colleges or agricultural department of colleges in each state or territory established, or which may hereafter be established, in accordance with the provisions of an act approved July 2, 1862, entitled 'An act donating public land to the several states and territories which may provide colleges for the benefit of agriculture and the mechanic arts,' or any of the sup-

plements to said act, a *department* to be known and designated as
an 'agricultural experiment station.' * * *

"Section 2. That it shall be the object and duty of
said experiment stations to conduct *original researches or*
*verify experiments* on the physiology of plants and animals;
the diseases to which they are severally subject, with the
remedies for the same; the chemical composition of useful
plants at their different stages of growth; the comparative
advantages of rotative cropping as pursued under a varying series
of crops; the capacity of new plants and trees for acclimation; the
analysis of soils and water; the chemical composition of manures,
natural and artificial, with experiments designed to test their com-
parative effects on crops of different kinds; the adaptation and value
of grasses and forage plants; the composition and digestibility of
the different kinds of food for domestic animals; the scientific and
economic questions involved in the production of butter and
cheese; and such other *researches or experiments* bearing directly
upon the agricultural industry of the United States as may in
each case be deemed advisable, having due regard for the vary-
ing conditions and needs of the respective states or territories.

"Section 4. That bulletins or reports shall be published at said
stations at least once in three months, one copy of which shall be
sent to each newspaper in the states or territories in which they
are respectively located, and to such individuals actually engaged
in farming as may request the same, and as far as the means of
the station will permit." * * *

"Section 5. That for the purpose of paying the necessary
*expenses of conducting investigations and experiments* and print-
ing and distributing the results as hereinbefore prescribed, the sum
of $15,000 per annum is hereby *appropriated to each* state, to be
specially provided for by congress in the appropriations from year
to year, * * * to be paid in equal quarterly payments, on
the first days of January, April, July and October in each year,
to the treasurer or other officer duly appointed by the governing
board of said colleges to receive the same, the first payment to be
made on the 1st day of October, 1887; *provided, however,* that out
of the first annual appropriation so received by any station an
amount not exceeding one-fifth may be expended in the erection,
enlargement or repair of a building or buildings necessary for car-
rying on the work of such station; and thereafter an amount not

exceeding five per centum of such annual appropriation may be so expended."

"Section 9. That the grants of moneys authorized by this act are made subject to the legislative assent of the several states and territories to the purposes of said grants." * * *

The $15,000 per annum named in the act were appropriated to the states, that is to say, donated to the several states to be used for the purposes for which they were set apart in the act. The donation was not to become effective until the legislatures of the several states assented to the purposes of the grants, that is to say, until the states accepted the trust. The trust was to be executed through colleges established in accordance with the provisions of the act of July 2, 1862, colleges presumably under the control and supervision of the states. Under this construction of the act this state accepted the grant in these words: "The state of Arkansas hereby accepts the appropriation made to her in common with other states by the act of congress, entitled 'An act to establish agricultural experiment stations in connection with the colleges established in the several states under the provisions of an act approved July 2, 1862, and of the acts supplementary thereto,' approved March 2, 1887, and said appropriation is *accepted* and assented to *in trust* for the uses and purposes expressed in said act of congress, and all moneys *received by the state* under said act of congress shall be and the same are hereby assigned and appropriated for use and disbursement to the Arkansas Industrial University, a college established at Fayetteville in this state, under the provisions of the act of congress approved July 2, 1862." Acts 1889, p. 32.

The government of the United States impliedly disclaimed all control over the "experiment stations" and over the $15,000 after it had been paid. This is indicated by section 3 of the act of March 2, 1887, which provides: "That in order to secure, as far as practicable, uniformity of methods and results in the work of said stations, it shall be the duty of the United States commissioner (now secretary) of agriculture to furnish forms, as far as practicable, for the tabulation of the results of investigations or experiments; to indicate, from time to time, such lines of inquiry as to him shall seem most important; and, in general, to furnish such advice and assistance as will best promote the purpose of this act. It shall be the duty of each of said stations, annually, on or before the first day of February, to make to the *governor* of the

state or territory in which it is located a full and detailed report of its operation, including a statement of receipts and' expenditures, a copy of which report shall be sent to each of said stations, to the said commissioner (now secretary) of agriculture and to.the secretary of the treasury of the United States." Under this section the secretary of agriculture is required to furnish friendly aid and advice, but no duty is imposed upon any one to accept it, and the government which is to control is indicated by the requirement of the report to be made to the governor of the state; and this is further indicated by the "experiment station" being subjected to the direction of colleges which are institutions of the states, and under their control and management.

By accepting the trust created by the act of March 2, 1887, the states assumed the burthen of executing it, and this they could do in part through appropriate acts of the legislature. There was no reason, no necessity, for congress specifically prescribing how the trust shall be executed, the states being competent for that purpose; and it has not done so.

It appears in the petition of appellant that the board of trustees of the Arkansas Industrial University, at a regular meeting held on the 14th day of June, 1889, adopted the following resolution:

"Resolved, (1) That the office of vice director and pomologist of the agricultural experiment station be, and the same is hereby, created, and that W. G. Vincenheller be, and he is hereby, *elected* to fill said position for the term of four years, ending June 30, 1903, at a salary of $2,000 per annum.

"(2) That *part* of the duties of said *officer* shall be in the testing of large fruits, for their quality, adaptation to different soils, acclimation, productiveness, periods of ripening, and method of culture.

"(3) He shall also attend and hold agricultural institutes in different parts of the state."

And that, upon being notified of the action of the board of trustees, appellant, W. G. Vincenheller, mentioned in the resolution,-at once accepted -in writing the place of vice director and pomologist of the agricultural experiment station upon the terms and for the salary mentioned in the resolution, and entered upon the discharge of his duties. Thereafter, the legislature of this state, by an act entitled "An act to provide for the support and maintenance of the University of Arkansas," approved May 23, 1901,

abolished the office of pomologist, and prohibited the board of trustees from allowing the incumbent of the office any pay for his services. The appellant contends that this act is violative of section 21, article 5, of the constitution of this state, which is as follows: "No law shall be passed except by bill, and no bill shall be so altered or amended on its passage through either house as to change its original purpose;" and that it is contrary to section 30 of article 5 of the constitution, which is as follows: "The general appropriation bill shall embrace nothing but appropriations for the ordinary expenses of the executive, legislative and judicial departments of the state; all other appropriations shall be made by separate bills, each embracing but one subject." It is insisted that the act in question is unconstitutional because it embraces more than one subject.

We have already stated the title of the act. The first section of it is as follows:

"Section 1. That the following sums are hereby appropriated for the support and maintenance of the University of Arkansas for two years, beginning April 1, 1901, and ending March 31, 1903, to-wit:" Then follow the several sums appropriated and the objects of the same, and then comes section 6, as follows: "Section 6. That the office of pomologist is hereby repealed and abolished. *Provided, further,* that the board of trustees is hereby prohibited from allowing any pay for the same."

The act of congress of March 2, 1887, provides that a *department,* to be known and designated as an "agricultural experiment station," shall be established under the direction of the college designated. A department of what? We think, of the college. This department, according to the terms of the act, can not exist independently of the college, but must be under its direction. It is wholly under the control of the college, and is as much a part of it as any other department of the same.

The resolution of the board of trustees that created the office of vice director and pomologist of the agricultural experiment station made it a duty of the officer to "attend and hold agricultural institutes in different parts of the state." For this and other services the appellant was to receive $2,000 per annum, to be paid out of the annual appropriation to be made under the act of March 2, 1887. This is in violation of the act, which provides that for the purpose of paying the necessary expenses of conducting investigations and experiments and printing and distributing the results

as prescribed in the act, the sum of $15,000 per annum should be appropriated, but that one-fifth of the first annual appropriation, and thereafter five per centum of other annual appropriations, may be expended in the erection, enlargement and repair of a building or buildings necessary for carrying on the work of such station. With this exception, the whole appropriation was to be expended in payment of the expenses of original researches and experiments, as provided for in section 2 of the act, and of printing and distributing the results thereof. We find no authority in the act for paying the expenses of attending and holding agricultural institutes.

The object of the act in question was the maintenance and support of the university of the state. Anything which will lessen the illegal or unnecessary expenses of that institution will tend to its legitimate maintenance. Economy and retrenchment, when the means are limited, are as necessary to the maintenance of universities as it is of individuals. The abolition of the office of pomologist relieved the university of an expense, and in part of an unauthorized expense, and left it with a larger appropriation to accomplish the legitimate objects of one of its departments. Section 6 of the act in question, by which this was done, related to, and tended to aid in, the general object of the act indicated in its title, and is not therefore in violation of sections 21 and 30, art. 5, of the constitution of this state. *State* v. *Sloan*, 66 Ark. 575.

Appellant also insists that the sixth section of the act of May 23, 1901, was unconstitutional because it impairs the obligation of a contract. If the place filled by the appellant, under the resolution of the board of trustees, was an office, it did not impair the obligation of a contract. For the duties and obligations of an officer grow out of the law, and not out of contract, and this law is subject to amendment or repeal, and, as an incident to this power the legislature may increase or diminish the salary, or abolish the office, unless prohibited by the constitution.

In *United States* v. *Maurice*, 2 Brock. 96, 102, 103, Chief Justice Marshall said: "An office is defined to be a public charge or employment, and he who performs the duties of the office is an officer. * * * Although an office is 'an employment,' it does not follow that every employment is an office. A man may certainly be employed under a contract, express or implied, to do an act or to perform a service, without becoming an officer. But if the duty be a continuing one, which is defined by rules prescribed by the government, and not by contract, which an individ-

ual is appointed by the government to perform, who enters upon the duties appertaining to his station without any contract defining them, if those duties continue, though the person be changed, it seems very difficult to distinguish such a charge or employment from an office, or the .person who performs the duties from an officer."

In *United States* v. *Hartwell*, 6 Wall. 393, it is said: "An office is a public station, or employment, conferred by the appointment of government. The term embraces the ideas of tenure, duration, emolument, and duties. * * * A government office is different from a government contract. The latter from its nature is necessarily limited in its duration and specific in its objects. The terms agreed upon .define the rights and obligations of both parties, and neither may depart from them without the assent of the other."

In *Dartmouth College* v. *Woodward*, 4 Wheat. 518, 629, 634, Chief Justice Marshall, in delivering the opinion of the court, said: "If the. act of incorporation be a grant of political power, if it create a civil institution to be employed in the administration of the government, or if the funds of the college be public property, or if the state of New Hampshire, as a government, be alone interested in its transactions, the subject is one in which the legislature of the state may act according to its own judgment, unrestrained by any limitation of its power imposed by the constitution of the United States." Again he says: "That education is an object of national concern, and a proper subject for legislation, all admit. That there may be an institution founded by government, and placed entirely under its immediate control, the officers of which would be public officers, amenable exclusively to government, none will deny."

The Arkansas Industrial University is an institution of the state, as we have already seen, subject to its control and government, through its own agents and appointees,—is an instrument of the state in the performance of a governmental work; and this is especially true of the department in which the appellant labored. The board of trustees, vested with the control and management of the university, and with the authority to create professorships and to adopt rules and regulations for the government and discipline of the university, created the office of vice director and pomologist of the agricultural·experiment station, and prescribed in part the duties of the office, and then elected the appellant to fill the same,

and he accepted and entered upon the discharge of the duties of the office. No agreement was entered into as to what the rights and obligations of the appellant should be, but the office was taken by virtue of an election, with the duties prescribed by law and the board of trustees, by virtue of the authority they believed was vested in them by law, which were annexed to the office, and would have followed it to the appellant's successor, if it had not been abolished. Under these circumstances, we think that the act of the legislature is constitutional, especially in view of the fact that the salary of the office was, in part, for the performance of service which involved a misappropriation of public funds.

The act in question is not retrospective in its operation, and does not affect appellant's right to pay for services rendered before its enactment.

Judgment affirmed.

BUNN, C. J., (dissenting). I do not think that there is any question of federal control, arising from its financial aid given to the support of the experimental stations under the management and control of the university. The state university, acting by and through the board of trustees, is the trustee of the federal fund, bound and obligated to see that it is properly devoted to the object named in the arrangement between the two governments. There could be no litigation over the matter in the state courts, because these parties are not the subjects of their jurisdiction in any case. Therefore there is no constitutional question of that kind before us.

In the opinion of the court, the rule requiring the pomologist to attend and hold institutes in different parts of the state was beyond the scope of the agreement of the state and federal government on this subject, and for that reason the federal fund could not lawfully be expended for that purpose, and, in so far, the resolution of the board of trustees creating the office and defining the duties was unauthorized. The experimental station was established for the purpose of aiding, or in order to aid, in "acquiring and diffusing among the people of the state useful and practical information on subjects connected with agriculture." I take it for granted that fruit-growing is generally considered a department of agriculture. At the time the original act of congress of 1862 and the amendatory and supplemental acts were passed, "institutes" were not in vogue in any department of learning, as they afterwards became and are now. No department of learning would be now considered

well conducted without the periodical institute, which answers somewhat the place of the normal school, when employed in this particular department. There is no department of agriculture in which the information of the average man of this state is so restricted and meager as that of fruit-growing. There is, moreover, no method of gaining information of this science and diffusing the same among the masses of the poeple, except by holding institutes, where instruction from the teacher is the beginning merely, but where the greatest benefit is found in the effort of the farmer pupil to put his acquired knowledge into practice, and to report the results in the institutes, and have his errors corrected there. This is acquiring and diffusing practical knowledge of the science in a way far superior to any other known method. This is, I think, the unanimous opinion of all educators worthy of the name. The board of trustees, under the act creating the university, is clothed with full power to determine the method of teaching and imparting instruction, and also of appointing teachers to carry out the ends in view. Shall it be said by any one that its efforts to exercise this broad discretionary power are beyond its powers? It seems to me that such exercise of power is not only lawful, but eminently wise, and ought not to be interfered with in any case except for directly assigned cause, established on proof. I am not to be understood as attempting to trench upon what is merely proper to be done in another department of the state government, but only to say what I think reasonable in refutation of the idea that the board of trustees went beyond its sphere in creating the office, for the purpose of pursuing this particular method of acquiring and imparting instruction and diffusing the knowledge thus gained.

The second contention of the plaintiff is that the act of the legislature of 1901, which abolished the office of vice director and pomologist of the experimental station, and directed that the future accruing salary should not be paid, was in the nature of an amendment presented as a clause of the original bill, making the regular biennial appropriations for the university, and was therefore passed in violation of the twenty-first section of article 5 of the constitution, which is as follows, to-wit: "No law shall be passed except by bill, and no bill shall be so altered or amended on its passage through either house as to change its original purpose." The original purpose of the bill was to make an appropriation to sustain the experimental station work. The object of the amendment was to abolish a department station work, and, the

amendment being adopted, the refusal to appropriate money for the work as asked for was thereby accomplished, not only for the ensuing two years, but for all time. A refusal to make the appropriation direct would, of course, have been germane to the subject of the bill, and an amendment increasing or decreasing the appropriation asked for in the original bill would have been germane to the subject, and therefore not in violation of the constitutional provision; but to accomplish the desired purpose by abolishing the office itself is not germane to the subject of the original bill, and therefore is, in my opinion, violative of the constitutional provision.

There has really been but one case in this court that I can find which can be made even remotely applicable to the state of facts in this case, and that is the case of *Loftin* v. *Watson,* 32 Ark. 414, where county scrip was sought to be made receivable for all debts of the county. The amendment was simply an exception of certain kind of debts, like interest and principal of the old indebtedness existing at the adoption of the constitution, etc. Now, the amendment was altogether germane to the subject of the original bill—a simple naming of the scope of it, and nothing more.

The case of *State* v. *Sloan,* 66 Ark. 575, has no application in this discussion, for no amending or altering act was involved in that case, nor was such a question raised. The discussion there was the application of sections 30 and 31, article 5, of the constitution.

I do not recall an instance where it is said that the direct control of a state educational institution by the legislature is allowable. The general rule is that such institutions are under the management and control of a board of trustees, and the legislature has a supervisory control merely. This is so for obvious reasons. But this direct control, it is said, is allowable, because the legislature, being the appropriating power, has necessarily the power to economize the appropriations. I have no disposition to controvert the position that the legislature has the power to make, or cut down, or refuse to make, appropriations, whether in the enterest of economy or not, but I am only contending that an amendment, presented on the passage of an act, however proper and rightful and authorized it may be in itself, cannot have any legal sanction when so adopted, if the constitution forbids its adoption in that way, and, from past abuses, the constitutional convention had the strongest reason for imposing the restriction it...

did upon the legislative department.  It has been a sort of habit among us to liberalize this class of constitutional restrictions by any sort of reasoning almost, but we have had reason to regret every instance of departure from the strict construction.

The last contention of the appellant is that his employment was a matter of contract, purely and simply, between himself and the board of trustees, who alone had power to act in the premises, and who accordingly made the contract with him; and that the act of 1901, by refusing to pay his salary for the ensuing two years and until the term of the contract expired, impaired the obligation of a contract, and was therefore in disregard of both the state and federal constitutions upon the subject.  This is answered by the defendant by the contention that the employment of the plaintiff was to perform the duties of a public office, the incumbent of which was a public officer, and for that reason, the legislature could lawfully abolish the office, and refuse to provide for the salary, at any time it might choose to do so.  The majority of the court sustain this view of the question, and in support of the opinion thereon cite the opinion of Chief Justice Marshall, presiding in the circuit court of the United States for the districts of Virginia and North Carolina, at its May term, 1823.  *United States* v. *Maurice,* 2 Brock. 96.  A definition of a public officer given in that case by Chief Justice Marshall is relied upon to support the decision in this case, and that definition is this:  "An office is defined to be 'a public charge or employment,' and he who performs the duties of the office is an officer.  Although an office is an employment, it does not follow that every employment is an office.  A man may certainly be employed under a contract, express or implied, to do an act or to perform a service, without becoming an officer.  But if the duty be a continuing one, which is defined by the rules prescribed by the government, and not by contract, which an individual is appointed by government to perform, who enters upon the duties appertaining to his station without any contract defining them, if those duties continue though the person be changed, it seems very difficult to distinguish such a charge or employment from an office or the person who performs the duties from an officer."

It is manifest that this definition is but an elaboration of a pre-existing definition that "an office is a public charge or employment," and also that the elaboration by the learned judge was only intended to cover the case under consideration.  Now, what was

that case? The secretary of war, without express authorization of act of congress, had appointed Maurice as "agent for fortifications," and, as the duties of that office included the receiving, disbursing and accounting for public moneys, he was required to give bond for the faithful performance of his duties, which he did in the usual form of official penal bonds. The suit was for a breach of this bond, in not accounting for certain funds thus committed to his charge, and it was, of course, instituted by the government. The question was whether it was a lawful bond, and whether suit could be maintained at all on it was the main question. In the discussion it was argued by the government that, under the circumstances, the defendant was a public officer, and the contrary was argued by the defendant. The court held, in effect, that the employment of Maurice, being without express authority, and not being by necessary implication, did not constitute a public office, but that, as he had failed to account for public moneys placed in his hands by an officer of the government having control of the subject-matter, with whom he had contracted to account for it by stipulation in the bond, justice and right demanded that he and his co-obligors and co-defendants be held liable on the bond, and it was so adjudged. Whether or not Maurice was a public officer and held a public office being a point under consideration, the court gave the definition above quoted, and decided that the defendant was not a public officer; and this decision was undoubtedly upon the ground that the employment, whether continuing or not, was founded on a contract It was a public service to be rendered, and public moneys were involved; but it was yet an employment based upon contract, there being no act of the legislative department directly upon the subject. I cannot see any application of that case to the case at bar, in support of the decision of the court.

Again, the court cites the celebrated case of *Dartmouth College* v. *Woodward,* 4 Wheat. 518, 715—a case too lengthy to admit of extracts here to any considerable extent and one too familiar, in fact, to require copious extracts. Suffice it to say that the only question of first importance in the case was whether or not certain acts of the legislature which sought to bring Dartmouth College under state influence and control impaired the obligation of the contract made by the King of England with the predecessors of the plaintiffs and the founder of the institution. The court held that, under the grant of the King of England, made in 1769, Dartmouth College was a private institution, and that, the charter being a

contract, the same could not be impaired by an act of the legislature of the state of New Hampshire, which succeeded to the powers of the King of England, and none other.

That was a contest between the board of trustees appointed in due course under the old charter against certain persons acting under the provisions of said acts of the legislature, and having thereby possession of certain books and records, for which the suit was brought by said trustees of the college. Had the case been decided in favor of the defendant—that is, had it been held that the institution was a public institution—it would have mattered little in this case, as it was a suit at the instance of the governing power, the trustees, and not the mere teaching force, or any member of it; and thus there is wanting a proper application of that decision to case at bar. All the arguments and more were made by the defendant's counsel in that case which were made by defendant's counsel in this case, and yet, with the stronger state of facts in many respects, the decision was against them. So, what matters it, even had the case been decided otherwise, so far as concerns the case at bar?

These are the only two cases cited by the court to sustain their view of the case in this contention. The quoted definition of a public office is all that is left upon which to rest the decision, as I see it. The interpretation of that definition given by this court is not the interpretation of Chief Justice Marshall, for his elaboration of it did not touch upon or include the particular question here involved, for none such was involved in either of those two cases except by a process of reasoning foreign to the subject in hand. Giving the interpretation of this definition the court gives to it, every teacher of the smallest district school would be a public officer, and his employment a public office. But we have not heretofore treated it in that way, but have always recognized their employment as a subject of contract. *School District* v. *Bennett,* 52 Ark. 511; *School District No. 49 of Faulkner County* v. *Adams, ante,* p. 159. "A professor in the state university" was held by the supreme court of Wisconsin not a "public officer," "in such a sense as prevents his employment as such creating a contract relation between himself and the board of regents."

The truth is, general definitions decide little or nothing; but it is the attendant facts and surrounding circumstances that must determine the question in any case. The plaintiff was, without doubt, employed by the board on a contract, and for a longer

time than the other teachers and members of the faculty held in the other departments, and for the very soundest reasons; for no first-class instructor would ordinarily undertake the work of teaching the farming public how to plant fruit trees and to prune, dress and cultivate them to the bearing stage in a shorter period than three or four years, for that length of time does it require to reach the maturity or bearing stage. The instruction intended was a new departure, and the first instructor necessarily assumed a more than ordinary responsibility, and naturally required more than one year's tenure to prove his work as a horticulturist. His contract was, then, not an unreasonable one. But it does not appear to have been attacked on the ground of unreasonableness. In fact, we can have nothing to do with a question like that. The question is, was the plaintiff's employment based on contract, and was that contract such as is protected by the constitutional inhibition against impairing the obligation of contracts. I think I have shown that the employment of the plaintff is not a public office, in the sense of the law giving to the legislature the power to abolish it to the injury of an incumbent serving for a stipulated pay for a stipulated time. But, in order to present the case in full, it may be well to quote the record as to the method and means of engaging the plaintiff's services. "The board of trustees of the unversity, at a regular meeting, held on the 8th of January, 1894 [which, I take it, was composed of different persons from those serving as such in 1898,— in some respects, at least], adopted the following resolution, namely :

"Whereas, the state experiment stations are maintained by the national government, and placed under the Arkansas Industrial University department of agriculture for direction and suggestion as to line of work, and it is the approved policy of the United States department of agriculture in all its scientific investigations to fix the time of office of its employees during good behavior or efficiency; and, whereas, a longer time than one year (the term of employment of other employees of the University) is required to plan and complete for publication any useful line of agricultural experiments, and for a proper continuation of scientific observations, the best interest of the Arkansas agricultural experiment stations demands that the station staff be made permanent for a longer period than as at present; and, whereas, the present experiment station staff is efficient and competent, and the experimental work performed and the condition of the experimental station is

S C—31

satisfactory to the farmers of the state; therefore, be it resolved, that R. L. Bennett, the present director, and present station's staff, be and they are hereby appointed to their present positions in the experiment station for the term of four years, or during their efficiency and good behavior, subject to removal for cause at any time, at the discretion of the board of directors."

And it is alleged and shown that, at a regular meeting held four years after, to-wit, on the 14th day of June, 1899, the board of directors, on the recommendation of R. L. Bennett, the director of the experiment station, adopted the following resolutions:

"*Resolved, first,* that the office of vice director and pomologist of the agricultural experiment station be, and the same is hereby, created, and that W. G. Vincenheller be, and he is hereby, elected to fill said position for the term of four years, ending June 30, 1903, at a salary of $2,000 per annum.

"*Second,* that part of the duties of said officer shall be the testing of large fruits, for their quality, adaptability to different soils, acclimation, productiveness, periods of ripening and method of culture.

"*Third,* he shall also attend and hold agricultural institutes in different parts of the state."

The petition states that the plaintiff, on being notified by the secretary of the board of trustees, accepted the said place, and has since performed the duties of same, and received his monthly pay for such up to the 1st of May last past; that on the 1st day of June, 1901, he demanded his warrant for May, and was refused same by the defendant. This suit was brought to compel the defendant to issue the warrant for that month's pay. The refusal was because of the abolition of said office and direction not to pay said salary by act of the legislature aforesaid.

Did the resolution of the board of trustees, and the acceptance of the appointments therein made, on the terms therein named, constitute such a contract as is protected by the provisions of the constitution under discussion. There seems to be but one answer to that question, and that in the affirmative. The judgment of the lower court should be reversed.