CHERRY v. LEONARD.

4-3734

Opinion delivered October 29, 1934.

*Verne McMillen,* for appellant.

*Trieber & Lasley, Walter L. Pope,* Attorney General, and *Robert F. Smith,* Assistant, for appellees.

*Owens & Ehrman* and *Griffin Smith, amici curiae.*

BAKER, J.   The appellant filed his suit in Pulaski Chancery Court praying for a restraining order to prevent the State Treasurer from paying out certain moneys, upon order of the Refunding Board, in the purchase of tenders of bonds, made to the Refunding Board, and which that board desires to accept.   Plaintiff alleged that he is a resident of Pulaski County, and that he is a taxpayer and interested in the contemplated acts of the State Treasurer and Refunding Board, which conduct complained of, he says, is in violation of the provisions of act No. 11, approved February 12, 1934; said act having been passed at the special session of the Legislature held in 1934.

Plaintiff alleges that said act No. 11, by the provisions of § 47, makes an appropriation of $100,000 for redeeming State highway refunding bonds and State toll bridge bonds during the period beginning the 1st day of January, 1934, and ending the last day of June, 1934,

and an additional appropriation of $350,000 for redeeming road district refunding bonds during the period beginning with the first day of January, 1934, and ending with the last day of June, 1934; and an appropriation of $20,000 for redeeming certificates of indebtedness during the period beginning with the first day of January, 1934, and the last day of June, 1934; an appropriation of $15,000 for redeeming funding notes issued to contractors during the period beginning with the first day of January, 1934, and ending with the last day of June, 1934; that said § 47 also makes an appropriation for all of said purposes in the total amount of $970,000 during the fiscal year beginning with the first day of July, 1934, and ending with the last day of June, 1935. The total appropriation made by said § 47 is $1,455,000.

Plaintiff states further that by the terms of said § 47 of said act No. 11 the appropriation made for use during the period beginning the first day of January, 1934, and ending the last day of June, 1934, has expired.

That the Refunding Board on the 27th day of July, 1934, passed a resolution authorizing the State Treasurer to draw a voucher for the full amount of the appropriation made for the period from January 1, 1934, to the last day of June, 1934, for the purpose of redeeming bonds that might be purchased by the State Treasurer on the 19th day of September, 1934. Plaintiff states that at the time said resolution was passed by the Refunding Board there had been no bonds offered for tender, and, under the terms of the call made, there could be no bonds offered for tender and no purchases made until the 19th day of September, 1934.

Plaintiff further states that neither the Treasurer nor Refunding Board has a right to use any portion of the moneys appropriated by the provisions of said § 47 of said act No. 11 for the period beginning with the first day of January, 1934, and ending the last day of June, 1934.

Plaintiff further states that, under the provisions of § 37 of said act No. 11, no refunding obligations can be purchased by the State Treasurer until there shall be on hand in the State Highway and Toll Bridge Refunding

Bond Redemption account and in the other redemption accounts, provided for in said act, funds in excess of the amount necessary to pay the interest and principal falling due in any fiscal year. That the State Treasurer is preparing to purchase bonds offered for redemption on September 19, 1934, when there are on hand funds in excess of the amount necessary for the semi-annual payments on refunding obligations next to accrue after the date of the acceptance of said tenders.

Plaintiff further alleges that the State Treasurer should not purchase any refunding obligations until there shall be on hand in the State Highway and Toll Bridge Refunding Bond Redemption accounts funds in excess of the amount necessary to pay the interest and principal falling due in the fiscal year, which ends June 30, 1935, and that at the present time there is on hand no funds in excess of said amount when there is taken into consideration all payments falling due on highway obligations during said fiscal year, there being on hand a sufficient amount of funds with which to purchase refunding obligations in the amount of $1,350,000 when there is provided, only for the semi-annual payments next to accrue; that the Treasurer and the Refunding Board should provide for all payments falling due in the fiscal year before using funds with which to purchase refunding obligations under the provisions of said act No. 11.

To this complaint a demurrer was interposed, sustained by the court, and the plaintiff refusing to plead further, the complaint was dismissed. The plaintiff, by his appeal, brings to this court, the matters alleged in his complaint.

It is necessary that we construe those particular sections of act No. 11 relied upon by the plaintiff, the appellant herein.

Act No. 11 is the result of settlement and compromise between the State of Arkansas and bondholders, holding State highway bonds, toll bridge bonds, and road improvement district bonds, which were assumed by the Martineau Act, passed in 1927, and other creditors.

We think it unnecessary to go into the complete and detailed history of the so-called Martineau Act and the amendments thereto, and the subsequent acts, in an effort to set out all of these obligations. It will be sufficient, however, to say that at the time of the passage of act No. 11, under consideration, the State had already defaulted in payments of its several obligations. Decreased revenue available for payment of these obligations, and extremely heavy bonded indebtedness, were such that, under the conditions that prevailed, suits had been filed and the funds of the State, whatever they were, were held under orders impounding the same, and it was seeming impossible, under the then existing statutory authority, for the State to meet its obligations.

After a long period of negotiations between the officers and agents of the State and committees of bondholders, certain facts were recognized that made it necessary to refund all of this indebtedness. The road improvement district bonds had, as their security, lands of taxpayers along, and adjacent to, the highways built by the improvement districts. An effort to enforce liens of the bondholders against these lands necessarily meant that the property owners, who were in most instances not able to pay the assessments, would not pay State and county and school taxes, and on that account the resources of the State, from which a large part of its revenue is derived, would be further destroyed, and the ability of the State to meet its obligations be so hopelessly impaired as to leave all creditors without remedy. These conferences between officers and agents of the State and bondholders' committees, were in full recognition of these general facts and other conditions equally potent and affecting both debtor and creditor alike. The ultimate result of these negotiations was act No. 11, which a special session of the Legislature was called to pass, and, when passed, to become a contract and settlement as between the State and its creditors.

It is on account of these facts that the writer of this opinion approaches his task with some degree of trepidation.

It is a well-recognized theory that in all conferences and negotiations of this kind, having the viewpoints of all of the varied interests represented, the result would ordinarily be entirely satisfactory, but it is also a matter of common knowledge possessed by those who are skilled and who are trained by experience and study that most instruments prepared under such conditions frequently are mere vehicles to bring forward, in certain parts thereof, individual ideas of some of those taking a part therein, as distinguished from the composite or combined judgment and decision of the entire body, and, by reason thereof, there may ultimately be some matters not in harmony with others, if not in direct conflict.

We think that, by mistake and oversight, certain matters appear in act No. 11 not intended to be there, but which were probably in some of the original drafts of the proposed act as it was in the course of study and preparation.

A careful reading of act No. 11 indicates that it was intended to be practical, so that it would work out and dispose of these troubles, aiding both the State and bondholders. It was not intended by either of the parties that there should be changes or amendments. Section 44 of the act expressly provides that it should be a contract between the State and its creditors, including the affected improvement districts, and that the terms of the contract, or contracts, should never be impaired by any subsequent legislation. The only purpose, under the circumstances, which judicial construction could serve ought to be for mutual benefit of the contracting parties.

Having all of these matters in mind, we consider the act, by beginning with § 2, which section creates an account in the State Treasury known as the State Highway Fund.

"The first charge upon the State Highway Fund shall be the cost of maintaining the State Highway system and the operation and maintenance of the toll bridges, and the Treasurer of State shall transfer from said State Highway Fund to the Highway Maintenance Fund 25 per cent. of the total amount credited to said State Highway Fund during any fiscal year, such credit

to be not less than $166,666 monthly and not more than $100,000 for each fiscal year may be appropriated for the operation and maintenance of said toll bridges."

The second paragraph of § 2, containing these provisions, indicates clearly that the contracting parties recognized the fact that all revenues must be obtained primarily by the maintenance of the State Highway System and in a condition so that the roads can be reasonably well used. It was known that local citizens would not buy cars or pay license fees, or buy gasoline upon which tax could be collected, unless there were roads upon which they might be operated, and travelers would avoid the State if highways were not such as to invite the traffic.

The next paragraph of § 2 provides for the transfer of certain funds to take care of certain conditions then prevailing, and the third paragraph of § 2 provides that all highway revenue credited to the State Highway Fund, in excess of the transfers and appropriations above provided for, shall next be applied in payment of interest upon the bonds and other obligations authorized to be issued or paid under the provisions of the act. The term "interest" as used shall be deemed to also include an amount equal to 3 per cent. per annum of the total par value of the road district refunding bonds, series B, issued hereunder. Any balance remaining after providing for the semi-annual payments next to accrue, shall be credited to and paid by the Treasurer of State into certain special accounts, created in the State Highway Fund, and for purposes as stated.

The first of these special accounts is to be known as the State highway refunding bond redemption account, and percentages for allocation of funds for the years of 1934, 1935, and 1936 are provided in that paragraph and also the amounts annually thereafter, and these amounts were pledged for the payment or redemption of the principal of State highway refunding bonds, series A and B, State toll bridge refunding bonds, series A and B, and DeValls Bluff Bridge Refunding bonds were in the same manner provided for by the act.

The second special account was created to be known as the Road District Refunding Bond Redemption Account, and percentages for allocation of funds were provided for in like manner as in the Highway Refunding Bond Redemption Account, but not in the same amounts, which were pledged for the payment or redemption of the principal of Road District Refunding Bonds, series A and B, and the State thereby covenanted with the holders of Road District Refunding Bonds that the amount in said Road District Refunding Bond Redemption Account should never be less than $500,000 during any fiscal year, and in like manner there was provided an account to be known as the Funding Notes Redemption Account, and, in addition, a Refunding Certificates of Indebtedness Redemption Account.

It will be observed from the reading of the act, and the foregoing statement of the effect of paragraph 2, that the several accounts created out of the State Highway Fund could come into being only after highway maintenance had been provided for, and after making allocation and provision for the payment of interest upon bonds and other obligations to be paid under the provisions of the act, and whatever was then left, was intended to be used to create the special accounts just above mentioned.

Trouble, however, seems to arise when we read § 37 of the act, which provides that ''whenever in any fiscal year there shall be on hand in the State Highway and Toll Bridge Refunding Bond Redemption Account funds in excess of the amount necessary to pay the interest and principal falling due in such year, such excess, or remaining, funds shall be applied by the Refunding Board in the purchase of State highway refunding bonds, series A and B, and State toll bridge refunding bonds, series A and B, and DeValls Bluff Bridge Refunding Bonds, at the lowest prices submitted, not exceeding par and accrued interest, in the manner provided by the act.''

It must already be apparent that the above mentioned special Refunding Bond Redemption Account is created out of the balance or surplus remaining after interest and other debt service obligations, for the next

fixed semi-annual payment shall have been provided for out of the general State Highway Fund. These special refunding redemption accounts were intended to be used in the purchase of bonds to be issued under this refunding act when tendered to the Treasurer under the conditions set forth in the act. It certainly was the purpose of the contracting parties that the State should have the right to pay for, and that the bondholders should have the right to tender, their bonds to be purchased by the State out of these special refunding accounts. The refunding accounts represent the amounts not needed after provisions shall have been duly made for maintenance of highways and for payment of interest and other obligations, as fixed in § 2, and it was wholly unnecessary to provide again in § 37 for a further reservation in these redemption accounts of interest for one fiscal year. It is expressly stated in § 2 of the act that the interest shall be allocated prior to the passing of any funds to the redemption accounts. The interest, annually, on all obligations would be in excess of three million dollars. The statement is sufficiently accurate for the purpose of this opinion. If it were the intention of the contracting parties that there should be an accumulation of funds for debt service of three million dollars annually, after these payments had already been provided for in § 2 of the act, then such a provision is unreasonable. The theory is without explanation that three million dollars should be held in the State Treasury for the payment of the debts, by reason of which both parties must lose, and by reason of which neither could gain in point of profit or security. The parties certainly did intend, as shown by the entire spirit of the act and its otherwise harmonious provisions, that the State should use these funds in these redemption accounts for the purpose of purchasing such bonds as might be tendered at prices deemed advantageous to the State, and in that way save to the State enormous amounts which would otherwise be paid in interest, and also operate to the benefit of those holding the bonds, by enabling the State to become more able, from time to time, as bonds are purchased, to meet its obligations.

There is most certainly a well considered, well defined and definite plan contained in the act, and the purpose of the act, approved by all of the parties, should not be permitted to be defeated and be made of no effect by this one provision for an unnecessary accumulation to pay obligations otherwise provided for in the act. The words ''in excess of the amount necessary to pay interest and principal falling due in such year,'' and after the following word ''such'' the word ''excess,'' in § 37, are unnecessary, and if permitted to remain in the act, will prove extremely injurious to the State, damaging the bondholders generally, and will operate to the defeat, for practical purposes at this time, of the legislative intent. To leave these words in the act, as written, would perhaps only affect the State Highway Bond Redemption Account, and Toll Bridge Redemption Account.

The second paragraph of § 37 relates to the Road District Refunding Bond Redemption Account and permits the use of funds available in this account to purchase Road District Refunding Bonds, series A and B.

If the offending words are necessary to the State Highway Bonds, it would be of vastly more importance that the same provision be incorporated as to the Road Improvement District Bonds, but these words were omitted in the provision relating to Road Improvement District Bonds and also omitted in the matter of Refunding Certificates of Indebtedness Redemption Account, and also omitted in the matter of Funding Notes Redemption Account, nor can these words, by interpretation, be, by any reason, read into the act as relating to these last several refunding bond accounts just mentioned.

It must appear to any one reading § 37, which is a provision for the use of the surplus funds, that the creation of these several redemption accounts and an allocation of these funds for the respective purposes set forth, that it was not the legislative intent to interject a phrase to defeat the purpose of the statute. Since that provision is contradictory, it must be treated as surplusage and the effect of the ruling of the chancery court upon that proposition, in so finding, is correct.

Our position is well stated in the following quotation from one of the briefs furnished us: ''In the decision of the issues involved in this appeal, the determination of the intentions of the Legislature is the primary factor. This court has frequently announced the doctrine that omitted words in legislative acts will be supplied and that unnecessary or contradictory clauses in acts will be deleted and disregarded in order to give effect to the clear legislative intent.

''In the case of *Snowden* v. *Thompson,* 106 Ark. 517, 153 S. W. 823, the court quoted from the earlier case of *Garland Power & Development Co.* v. *State Board of Railroad Incorporation,* 94 Ark. 422, 127 S. W. 454, as follows: 'In order to conform to the legislative intent, errors in an act may be corrected or words rejected and others substituted.'

''In the case of *McDaniel* v. *Ashworth,* 137 Ark. 280, 209 S. W. 646, the court again quoted this language with approval, and stated: 'The whole subject was reviewed in the case last cited and the doctrine was made plain that the duty of the courts in interpretation of statutes was to endeavor to ascertain from the language used the true intention of the lawmakers, and, when that intention was ascertained, to disregard everything which was in conflict with that intention, and, if necessary, to omit words or substitute others so as to make the statute harmonize with the manifest will of the lawmakers.'

''The case last cited is that of *State ex rel.* v. *Trulock,* 109 Ark. 556, 165 S. W. 16.

''The more recent case of *Hazelrigg* v. *Board of Penitentiary Commissioners,* 184 Ark. 154, 140 S. W. (2d) 998, adheres to the rule above announced, citing the former cases above mentioned and many others.''

One other question is submitted to us for determination, and that arises under § 46 of act No. 11. The provision of paragraph (a) is to the effect that there is appropriated, payable from the State Highway Fund, for the maintenance and repair of the toll bridges owned by the State for the period beginning January 1, 1934, and ending June 30, 1934, the sum of $25,000; and for the fiscal year ending June 30, 1935, the sum of $50,000.

This is an example of several different items of appropriations.

The writer must confess that the wording of these appropriations is such as to give trouble, but the language used as to these appropriations must be construed "by the law of reason," and this may be done under the same authority as we have just above cited. It certainly cannot be found harmonious with the spirit of the act to say that it was the purpose of the Legislature to create and establish dead funds. It must have been the purpose, and we so hold, that the dates fixed in the language of these appropriations, in this particular act, was intended to fix merely the amount of money appropriated out of such funds as might arise during the particular period set out in the act and that it did not intend to say, and it does not say, expressly or impliedly, that such sums of money must be used, as being appropriated for use only during that particular period. The Legislature knew something of the financial condition of the State. It did not want the appropriations fixed for use through and to the end of the biennial period to be taken out of the first moneys that might be collected, but intended to fix amounts to be taken out of funds arising during the several periods, and such funds are certainly available to the end of the period. This is the only conclusion that can be arrived at in harmony with the evident and expressed purpose of act No. 11. We believe this to be the legislative intent; that it is in accordance with the terms of the agreement and contract between the State and its creditors; that it in no manner impairs the act in any respect.

It follows therefore that the chancellor was correct, and the case is affirmed.