COTTRELL *v.* FAUBUS, GOVERNOR.

5-2475            .            347 S. W. 2d 52

Opinion delivered June 5, 1961.

[Rehearing denied June 23, 1961.]

*Warren & Bullion,* for appellant.

*J. Frank Holt,* Attorney General, by *Jack Holt, Jr.,* Asst. Attorney General, for appellees; *Mehaffy, Smith & Williams,* by *William J. Smith* and *B. S. Clark,* for interveners, *Herman Lindsey,* et al.; *James L. Sloan,* amicus curiae.

J. SEABORN HOLT, Associate Justice. The appellant, as a citizen and taxpayer, brought this suit for a judgment declaring Act 442 of 1961 to be unconstitutional. The original defendants were the Governor, the State Treasurer, and the members of the State Construction Board created by the act in question. Various state agencies, beneficiaries of the act, were permitted to intervene in the case. The appellant's principal allegations of unconstitutionality are that the act is an omnibus bill of the type prohibited by Article 5, Section 30, of

the constitution, and that the act delegates legislative power to the Construction Board, in violation of Article 4 of the constitution. The trial court sustained a demurrer to the complaint and dismissed the suit, thus in effect holding the act to be constitutional.

It is necessary to consider only the first allegation of unconstitutionality. We hold that Act 442 is clearly in violation of Article 5, Section 30, which reads as follows: "The general appropriation bill shall embrace nothing but appropriations for the ordinary expense of the executive, legislative and judicial departments of the State; all other appropriations shall be made by separate bills, each embracing but one subject."

Act 442 contains at least 24 separate appropriations, totaling $12,478,000. Disregarding Section 9, which might be said to involve merely the transfer of funds, the appropriations made by the act may be summarized as follows:

Section 2 appropriates $800,000 for the Municipal Aid Fund.

Section 5 makes 16 appropriations for construction, improvements, repairs, etc., for State agencies and institutions as follows: Penitentiary, $350,000; Industrial and Training Schools, $650,000; Water System for Training School for Girls, $100,000; Vocational Trade School, $500,000; Library Commission Building, $500,000; National Guard Armories, $500,000; State Livestock Show, $500,000; Remodeling State Capitol, $250,000; State Parks, $2,900,000; Prairie Grove Battlefield Commission, $50,000; Arkansas Post, $65,000; History Commission, Archives, $25,000; Repairs to State Capitol, $135,000; Establishment of Diagnostic Clinics, $100,000; State Police, Construction of Communication Systems, $100,000; A. M. & N. College, Remodeling and Repairs, $150,000.

Section 6 appropriates $338,000 for District and County Livestock Shows.

Section 7 appropriates $2,000,000 for Salaries of Classroom Teachers.

Section 11 makes 5 appropriations for construction, improvements, repairs, etc., for State agencies and institutions, as follows: Tuberculosis Sanatorium, $500,000; Military Department, $300,000; Children's Colony, $400,-000; State Hospital, $1,250,000; State Parks, $15,000.

It is settled by many cases that the purpose of a constitutional provision such as Article 5, Section 30, quoted above, is to prevent the inclusion of separate and unrelated appropriations in a single bill, because that practice opens the door to the evils that have come to be known as logrolling and pork barrel legislation. The general subject was first considered by this court in *Fletcher* v. *Oliver,* 25 Ark. 289, which involved a provision, in effect similar, in the constitution of 1868, requiring that no act embrace more than one subject. It was there said: "The object of this clause was to prevent combinations, by which various and distinct subjects of legislation should gain support, which they could not if presented separately." And in *Palmore* v. *State,* 29 Ark. 248, the thought was repeated in this language: "The constitution required singleness of subject, to prevent omnibus bills, by which various distinct schemes could be united in one bill, and the like, and the friends of separate measures be thus united to carry through measures which, alone, could not be passed."

Under the constitution of 1874 the leading case appears to be *State* v. *Sloan,* 66 Ark. 575, 53 S. W. 47, 74 Am. St. Rep. 106. In that case the court upheld an act which provided that a new state capitol should be built upon what was then the site of the state penitentiary, and, further, that the penitentiary commissioners should abandon the penitentiary grounds and construct a new penitentiary elsewhere. After pointing out that the different parts of an act must, under the constitution, relate directly or indirectly to the same object, the court adopted this rule: "The unity of the subject of an appropriation is not broken by appropriating several sums

for several specified objects, which are necessary or convenient or tend to the accomplishment of one general design, notwithstanding other purposes than the main design may be thereby subserved." Since the legislature had directed that the new capitol be erected where the penitentiary stood it was evidently necessary to construct a new penitentiary for the safekeeping of convicts, as required by law. Hence the act embraced only one subject, which the court stated to be "the building of a state capitol upon the ground now occupied by the penitentiary."

The decision in the *Sloan* case is controlling here and indicates the invalidity of Act 442. This act contains more than a score of distinct appropriations for miscellaneous and disconnected subjects. It cannot seriously be contended that only one subject is embodied in a bill which makes separate appropriations for municipal aid, the penitentiary, schools, livestock shows, classroom teachers' salaries, the children's colony, the state parks, and several other purposes. The constitution was intended to prohibit the passage of just such an omnibus bill as this one.

We do not seem to have previously had occasion to hold an act invalid under this section of the constitution, but the reason is that no prior act considered by this court has even remotely resembled Act 442 in its wide diversity of unrelated purposes. In *Fletcher* v. *Oliver,* cited above, it was argued that an act providing for the construction of highways and bridges embraced two subjects, but we upheld the act for the obvious reason that bridges are essential parts of highways. In *Ward* v. *Bailey,* 198 Ark. 27, 127 S. W. 2d 272, it was held that an appropriation of $5,000 for various necessary expenses of the State Investment Board, all in connection with a refunding of bonds, was not an omnibus appropriation. The only prior case that can be regarded as having presented even a doubtful situation was the *Sloan* case, and we have discussed the grounds upon which the court concluded that only a single subject was involved there.

The diversified purposes embraced by Act 442 are so clearly disconnected that the appellees do not even argue that the several appropriations relate to a single subject-matter if the question is to be tested by the various appropriations themselves. It is insisted, however, that the act disposes of surplus funds and therefore such funds should be declared to be the only subject of the bill, thereby satisfying the constitutional requirement. In this connection an Oklahoma case, *Black* v. *Okla. Funding Bond Commission,* 193 Okla. 1, 140 Pac. 2d 740, is cited. That case is not similar to this one, because there the act appropriated net surplus revenues for one purpose only, the retirement of outstanding bonded indebtedness. There was no diversity of subject-matter such as appears in Act 442.

The only way appellees could possibly argue, with any semblance of logic, that Act 442 is constitutional is to contend that the single subject of the act is money. To sustain that contention would be to entirely erase the provisions of Article 5, Section 30 of the constitution and would make it possible to substitute a single appointive board for the legislature in the matter of appropriating state revenues.

Act 442 cannot be sustained on the theory that the appropriation of surplus funds to a great variety of objects constitutes a single subject within the meaning of the constitution. The constitution makes no exception in the case of surplus funds; it applies to all appropriation bills. In the *Sloan* case it was said that the several specific objects must relate to one main design. We cannot say that the General Assembly's main design in adopting Act 442 was simply to spend up to $12,478,000 of the taxpayers' money, so that the selection of the various purposes for this huge outlay would become merely a consideration secondary to the main design.

An additional and, we think, conclusive reason for rejecting this surplus funds theory is to be found in the fact that the determination of what constitutes surplus funds lies entirely within the discretion and control of the legislature. It appears that funds in the state treas-

ury can be regarded as surplus if they have not yet been appropriated or if they fall in that classification under the Revenue Stabilization Law. Ark. Stats., § 13-501 et seq. Both these matters are wholly subject to legislative control. Yet Article 5, Section 30, of the constitution was evidently intended to serve as a restraint upon the legislature. If, however, the present argument should be upheld the restraining power of this section would be destroyed, for the legislature could, at any point in its session after the adoption of the general appropriation act, declare all remaining public funds to be surplus and therefore subject to inclusion in an omnibus bill. The constitution clearly should not be construed in such a way as to defeat its own purpose, but that would be the effect of sustaining the appellees' contention.

It is also argued that the legislature has occasionally adopted bills, such as those to pay claims against the State, that are said to contain appropriations for more than one subject. It is not necessary for us to express an opinion as to the validity of such measures, since the fact that the legislature may have passed one unconstitutional act obviously does not give it the power to pass another.

Act 442 is plainly unconstitutional upon the first ground argued by the appellant; so it becomes unnecessary to consider the question whether it also contains an improper delegation of legislative power. It is noted that the act contains a separability clause, but no one of the various appropriations can be upheld to the exclusion of the others. In the absence of any indication of the legislative preference there is no basis for this court to conclude that by the separability clause the General Assembly meant for some particular appropriation to be upheld.

The decree is reversed and a judgment will be entered in this court declaring Act 442 to be unconstitutional in its entirety. It is so ordered.

WARD, J., concurs.

HARRIS, C. J., ROBINSON and JOHNSON, JJ., dissent.

PAUL WARD, Associate Justice, concurring. This concurrence in no way indicates that I do not agree with the reasons and reasoning contained in the majority opinion. It is however prompted by a two-fold purpose: One, to reply to certain arguments advanced in support of Act 442; and Two, to suggest an additional reason for sustaining the conclusion reached by the majority.

*One.* To uphold the constitutionality of Act 442 reliance is placed on two general principles of statutory construction: (a) The presumption of constitutionality, and; (b) Legislative construction.

(a). *Presumption of Constitutionality.* It is readily conceded there is a well established and universally accepted principle of law to the effect that acts of the legislature are presumed to be constitutional, but it is my purpose to point out an important limitation (also universally recognized) to this principle. A clear statement of this limitation is found in 11 Am. Jur., page 732, Constitutional Law, § 99 (sub-topic, "Limitation of Doctrine"). It reads:

"The principles favoring liberal construction in favor of constitutionality are accompanied by limitations as well fixed in the law as the liberal doctrines themselves. The rules are well established, therefore, that it is only where the language of the act will bear two constructions that a court is justified in adopting a construction that will sustain the act, rather than one which will defeat it. The courts are not at liberty, in order to sustain a statute, to give to it a forced construction or to read into it and interpolate words which do not appear in the language enacted by the legislature. Where the language used in a statute is plain, the court cannot read words into it that are not found therein either expressly or by fair implication, even to save its constitutionality, because this would be legislation, and not construction. Hence, if the text of an act is unambiguous, it may not be rewritten to accomplish the purpose of preserving the law."

The above principle is sustained by numerous court decisions and text writers. In 16 C.J.S. at page 408, Constitutional Law, § 99 (sub-topic, *"Inapplicability or Limitation of Presumption"*) there appears this statement with reference to the presumption of constitutionality:

"The presumption does not apply, or its operation is given a narrower scope, where the statute shows on its face a violation of constitutional provisions; nor does it apply where such a presumption would defeat constitutional provisions."

There is no room for argument about the validity of the rule or the validity of the limitations. I need only to mention, therefore, what has already been established by the majority opinion—the wording in Art. 5, § 30 of the Constitution is plain and unambiguous. It reads, ". . . all (other) appropriations shall be made by separate bills, each embracing but *one subject.*" (Emphasis supplied.) Likewise one thing is crystal clear about Act 442: no process of reasoning or strained interpretation can erase the plain fact that it contains many appropriations relating to more than *one subject.* It is too plain for argument that the framers of the Constitution were not referring to *money* when they used the word *subject.* If *money* is interpreted to be the same as the word *subject,* then the Constitution has been rewritten and all safeguards contained in Art. 5, § 30 have been swept away. If what we have said above is true, and I submit it is true, then the rule of presumption of constitutionality has no application in the case under consideration.

(b). *Legislative Construction.* The essence of the contention of appellees in this connection is that since the legislature has frequently, over a long period of years, passed acts similar to Act 442, there arises a presumption that Act 442 is constitutional. One answer to this contention is that our legislature has never before passed an act like the Act in question, hence no foundation has been laid for the application of this well recognized rule. However, regardless of the differences of opinion concerning the

similarity of Act 442 to other acts, there is another reason why the rule invoked by appellees has no application in this case. One of the authorities which clearly states the rule of presumptions in this connection is 11 Am. Jur. at page 699, and it must be conceded that such rule is generally approved by the courts of this and other states. It is pointed out however that, as in the presumption rule heretofore discussed under paragraph (a), there is a well recognized and established exception or limitation to the general rule of legislative construction. At page 698 of the authority last above cited there appears this statement:

"The giving weight to contemporaneous construction put upon an enactment by those charged with its execution applies only in cases of *ambiguity* and *doubt*. Plain and unambiguous constitutional provisions *cannot* be varied by legislative, executive, or departmental construction. There is no room for construction of a Constitution outside of the words themselves, if they are unambiguous, and the rules as to the authority of contemporaneous exposition are *unimportant* in such cases. The construction placed upon a constitutional provision by the legislative and executive branches of the government will not be permitted to overturn and render nugatory a clear provision of the Constitution, in cases where the meaning of a clause in the instrument is capable of two interpretations." (Emphasis supplied.)

It is difficult to understand how fair and reasonable minds can find any doubt or ambiguity in the language of the Constitution heretofore set out or can find that Act 442 deals with only *one subject*. Such being the case, the rule invoked by appellees, just discussed, has no application in this litigation, and it is our right and duty to declare said Act unconstitutional. In this connection attention is called to the language used in 16 C.J.S. at page 293:

"It has become a settled canon of American jurisprudence that the final authority in determining whether or not the legislature, in enacting a statute, acted within its constitutional authority is vested in the judiciary, and

that, in a proper case, it is not only the *right* of the courts but also their *duty* to consider such a question, and to declare invalid an unconstitutional statute, and this obligation of the courts to act exists no matter how desirable or beneficial the attempted legislation may be, . . . ." (Emphasis supplied.)

It is permissible liberty for the courts to construe related matters (in doubtful situations) as *one subject,* as was done in *State* v. *Sloan,* 66 Ark. 575, 53 S. W. 47, and *Ward* v. *Bailey, Governor,* 198 Ark. 27, 127 S. W. 2d 272, but it is an abuse of liberalism—it is license— to classify a penitentiary, a training school, an armory, a diagnostic clinic, and a state park as *one subject.* Therein lies the essence of the paramount issue in this litigation.

*Two. Delegation of Legislative Powers.* It is my judgment that Act 442 also violates Art. 4, §§ 1 and 2 of the Constitution. Said sections, in essence, provide for three separate and distinct departments of government and that neither can exercise any power belonging to either of the others. As these sections apply to an attempt by the legislative department to delegate its power to the executive department, the rules and principles are amply and clearly defined by our own decisions. Set out below are summary excerpts from four decisions of this court where acts were held not to contain unlawful delegations of legislative power, but in which are announced certain rules that must be applied in the case under consideration. In *Boyd* v. *Bryant,* 35 Ark. 69, (at page 74) the court said:

" 'The legislature can not delegate the power to make laws, but it can make a law to delegate the power to determine some fact or state of things upon which the law makes or intends to make its own action depend.' "

The above quotation was approved almost word-for-word in *Nall* v. *Kelley,* 120 Ark. 277 (at page 285), 179 S. W. 840; *Johnston* v. *Bramlett,* 193 Ark. 71 (at page 74), 97 S. W. 2d 631; *Gross* v. *Homard,* 201 Ark. 391 (at page 396), 144 S. W. 2d 705.

In the following cases this court found that unlawful delegation of legislative powers existed. In the case of

*City of Harrison* v. *Snyder*, 217 Ark. 528, 231 S. W. 2d 95, this court had under consideration an ordinance of the City of Harrison fixing a garbage collection fee of $1.50 per quarter for each single family dwelling house, and empowered the Mayor, the City Health Officer, and the Sanitation Committee of the City to determine the fee to be paid by commercial and industrial houses. The court, in striking down the ordinance, because of an unlawful delegation of legislative power by a Municipal Council, first made this statement, " 'The right to delegate power by municipal authorities rests on the same principle and is controlled in the same way as the delegation of the legislative power by state . . . .' " Following this, the court quoted with approval (at page 531 of the Arkansas Reports) the following:

" 'The rule is well settled that legislative power cannot be delegated. So far as the powers of a municipal corporation are legislative they rest in the *discretion* and *judgment* of the municipal body intrusted with them, and the general rule is that the body cannot delegate or refer the exercise of such powers to the *judgment of a committee* of the council, or an administrative officer of the city.' . . . this rule does not preclude the appointment of administrative agents for the performance of *administrative* or *ministerial* duties in making effective the legislative will. . . . 'There is a clear distinction between legislative and ministerial powers. The former cannot be delegated; the latter may. Legislative power implies *judgment* and *discretion* on the part of those who confer it.' " (Emphasis supplied.)

In *Crowly* v. *Thornbrough, Commissioner of Labor,* 226 Ark. 768, 294 S. W. 2d 62, the court struck down Act 115 of 1955 which attempted to delegate to the Secretary of Labor of the United States the right to fix a minimum wage scale to be paid in a particular area of Arkansas. The reason for the court's action is set forth in the following excerpt from the opinion (at page 774 of the Arkansas Reports):

"The Act fails to establish a *standard* or *formula* by which a wage scale may be formulated; but rather dele-

gates to the Secretary of Labor of the United States the right to fix the minimum wage scale to be paid in a particular area of this State. The State retains *no control* over the Secretary of Labor of the United States, therefore the Act violates Article 4, Sections 1, 2 and Amendment 7 to our State Constitution.'' (Emphasis supplied.)

It is now in order to examine briefly the provisions of Act 442 to see if it leaves any matters of *judgment* and *discretion* to the Board, whether or not the legislature retains any *control* over the action of the Board, and whether or not it sets forth any *standard* or *formula* for the Board to follow in determining where any building shall be located, how many shall be constructed, or which institutions shall receive assistance. Set out below is my own interpretation, very briefly stated, of what each pertinent section provides together with appropriate comments:

*Section 1* says the *purpose* of Act 442 is to use state revenues to implement the Act. One of appellees' arguments to sustain the Act is that it appropriates only *part* of the revenues. This appears to be a fallacious argument for the reason that, by the same token and the same reasoning, the legislature could hand over *all* of the state's revenues to a similar board. *Section 3* creates a Board composed of the Governor, two of his direct appointees and two persons employed by the University of Arkansas. It is noted that where the money is not spent for construction and improvements, the last two members are merely figureheads. *Section 5* provides money for the acquisition or construction of a penitentiary, a water system for the Training School for Girls, National Guard Armories, Livestock Shows, State Parks, a Diagnostic Clinic, etc.

I can find nowhere in the Act where the legislature has retained any control over the Board. As I read it, the legislature has made the Board the sole judge of the state's need for many, if not all, of the enumerated projects; the sole judge of the qualifications of many of the institutions applying for assistance. In this connection it is appropriate to note the well established rule that in testing the

powers granted in an act of the legislature we must look to what could be done. This is not a temporary act of the legislature, and while the legislature and the people may have complete confidence in the wisdom and discretion of the present Board, it must be recognized that great abuses of discretion and judgment are possible under the Act. The Board can, in its sole discretion, (a) build a school or an armory, (b) locate the building in any town that meets its fancy, and (c) spend as much or as little money on the project as it sees fit within the limitations provided in the Act. As an illustration, the Board could help the school teachers or not help them within its own discretion. This item is emphasized because it appears to stand in a class by itself. In all other instances the appropriations appear to be absolute and unqualified, but in the case of the school teachers it reads, ''$2,000,000, or so much thereof as *may be available.*'' (Emphasis supplied.) Judging the Act, as we must, by its potentialities, the Board could be so generous in providing for the other institutions as to seriously deplete the money ''available'' to help the teachers.

On the whole, I refuse to believe the framers of our Constitution ever once expected the legislature to relinquish to a single Board, restrained only by its own discretion, the right and power to expend tax revenues in the best interest of all the people.

CARLETON HARRIS, Chief Justice, dissenting. I feel that this Court is placing too narrow a construction on the provisions of Article 5, § 30, of our State Constitution.

In the opinion, the Majority, referring to that section, state:

''We do not seem to have previously had occasion to hold an act invalid under this section of the Constitution, but the reason is that no prior act considered by this Court has even remotely resembled Act 442 in its wide diversity of unrelated purposes.''

I deem it exceedingly unusual and passing strange, considering the numerous sessions of the Legislature held

since 1874, and the literally hundreds of appropriation bills passed, that no challenge has been made on the point involved, until the instant litigation. Certainly, it is not because this is the first appropriation measure (other than the general appropriation bill) that has appropriated money in the same bill for more than one subject. The Acts of the General Assembly, throughout the years, contain numerous measures that appropriate money for divers purposes, all totally unrelated. Were I to list all of them, this dissent would reach an undue length; accordingly, I shall only mention a few to illustrate my point. Act 205 of 1903, entitled "An Act to Appropriate Money to Supply Deficiencies in Appropriations Heretofore Made", contains, *inter alia,* the following: Deficiencies and Contingent Expenses, Governor's Office; Contingent Expenses, Supt., Public Instructor's Office; Contingent Expenses, Supreme Court; Fuel, Water and Lights; Fees of Registers, United States Land Offices; To Pay State Proportion of Assessors' Fees; For Amount Overdrawn on Assessors' Fees; Salary of Clerk in Attorney General's Office; To Pay for the Publication of University Magazine and Annual; Current Expenses, Lunatic Asylum; Current Expenses, Deaf Mute Institute; Current Expenses, Blind School; Maintenance, Soldiers' Home; Pensions (to two ladies, not stated what pensions are for); $359.20 for the Purpose of Paying Yell County for Prosecuting and Executing a Penitentiary Convict.

Also, Act 81 of 1889 appropriated money from the State Treasury in the same bill for the following purposes: Rewards for Fugitives; Printing, Binding, Etc.; Miscellaneous. This last item provided appropriations for various and sundry items for the Supreme Court, fees for certifying lists of forfeited lands, coal furnished state offices, to pay coroner for holding inquisition on convicts, and various other items.

Still further, Act 118 of the General Assembly of 1921, provides the following appropriations from the General Revenue fund:

"Amount claimed by Mrs. H. H. Railey for special services in connection with work of charities and correction commissions prior to the date when its operation was suspended ..............$ 246.05

Deficiency in State's part of assessor's fees ........ 8,350.00

County clerk's fees for making tax books of 1920 —State's one-fourth part ..................... 20,000.00

Claim of W. E. Hawkins for reward offered for arrest of Stewart Thomas ..................... 150.00

Various claims for refund of taxes erroneously paid as per list on file in Auditor's office ............... 542.08

Claim of E. W. Brockman for special services as prosecutor, as per account on file in Auditor's office ..................... 300.00

Claim of Senator B. E. McFerrin for services as Lieutenant Governor—205 days during 1919 and 1920 ..................... 2,847.45

Claim of R. E. Wiley for services as special judge prior to April 1, 1919 ..................... 20.00

Claims of various persons for expenses and rewards in connection with arrest and returning to this State of fugitives from justice as per list on file in Auditor's office ..................... 1,079.05

Claim of R. Lively and D. Owen for extra work at an extraordinary session of the General Assembly, 1920 ..................... 20.00

SECTION 2. There is hereby appropriated, to be payable from the sinking fund, the following:

To pay the interest coupons due on the Brough notes on March 1, 1921 ..................... 17,812.51

SECTION 3. There is hereby appropriated, to be payable from the Northwest Arkansas tick fund, the following deficiency item:

For supervision of cattle dipping in accordance with Governor's deficiency proclamation ........... 4,843.57"

This is followed by the Emergency Clause.

Even a cursory search reveals that at least a dozen other similar measures were passed from 1883 until 1921.

736

The Majority say: ·

"It is also argued that the legislature has occasionally adopted bills, such as those to pay claims against the State, that are said to contain appropriations for more than one subject. It is not necessary for us to express an opinion as to the validity of such measures, since the fact that the legislature may have passed one unconstitutional act obviously does not give it the power to pass another."

However, I deem it proper and pertinent to the issue herein involved, to point out, as hereinbefore shown, that within *nine years after the adoption of the Constitution,* appropriation bills, embracing more than one subject, were passed. It appears to me, that no attack, as in the instant case, was made upon these, and similar measures, for the reason that such appropriations were not considered a violation of the Constitution, and I am persuaded that the Legislators and practicing attorneys living in that period (many of whom, I feel sure, were members of the Constitutional Convention), were more cognizant of the intent of the framers of that document than those of us who attempt to interpret the section over seventy-five years later. But if this reasoning be fallacious, then I urge yet another ground why time itself lends support to the validity of Act 442. Volume 6, Ruling Case Law, § 60, p. 63, provides:

"The principle of contemporaneous construction may be applied to the construction given by the legislature to the constitutional provisions dealing with legislative powers and procedure. Though not conclusive, such interpretation is generally conceded as being entitled to great weight, and should not be departed from unless manifestly erroneous."

This principle has been applied in numerous cases over the nation. As stated in *Pressman* v. *D'Alesandro,* 211 Md. 50, 125 A. 2d 35 (1956):

"It is an accepted rule that a contemporaneous construction of a provision of the State Constitution by the Legislature, which has been acquiesced in for a long period of time and uniformly followed, furnishes a strong presumption that the provision was correctly interpreted and

is a valuable aid in determining the intention of the framers. (cases cited) That rule is based on the theory that the interpretation placed upon the Constitution by the contemporaries of its framers is entitled to respectful consideration, inasmuch as they had the best opportunities for learning the intention of the framers and the understanding of the people who ratified the Constitution.''

Let us again consider the statement of the Majority that no act has been considered by this Court ''which remotely resembles Act 442 in its wide diversity of unrelated purposes.'' This, I am sure, is a correct statement, but I desire to point out that this Court *has* considered the constitutionality of an appropriation act which dealt with more than one subject. The purpose of Act 223 of the Extraordinary Session of the General Assembly of 1939 is set out in the title of that Act, as follows:

''AN ACT to Provide for the Issuance of State Penitentiary Refunding Bonds to Retire Outstanding Penitentiary Funding Notes, Issued Under Authority of Act 246 of 1933, and Outstanding Penitentiary Warrants; for the Issuance of Arkansas State Teachers Refunding Bonds to Retire Outstanding Arkansas State Teachers Certificates of Indebtedness Issued Under the Provisions of Act 89 of 1935; for the Issuance of State Permanent School Refunding Bonds to Retire Permanent School Bonds Issued Under the Provisions of Act 128 of 1917 and 356 of 1921 and State Debt Board Notes Issued Under the Provisions of Act 337 of 1935, for Investment of a Limited Amount of Cash Balance in the State Treasury in Obligations of the State; for Revenues to Service the Bonds Issued Hereunder; for Appropriations to Carry Out the Provisions of This Act; and, for Other Purposes.'' I will concede that this Act only concerns four subjects, but, to me, that is of little moment—whether it affects four or twenty-four is purely a matter of degree. I see no connection between the State Penitentiary and the Arkansas State Teachers College, other than both had an outstanding indebtedness. Act 223 of 1939 was attacked in the courts, and, *inter alia,* it was contended that same violated Section 30 of Article 5, here under discussion. This Court

did not accept that contention, and sustained the validity of the Act. See *Ward* v. *Bailey,* 198 Ark. 27, 127 S. W. 2d 272. The Majority brush aside this case by stating that this appropriation was "all in connection with a refunding of bonds." That, then, appears to be the answer of the Majority, *i.e.,* this act referred solely to "refunding". I suppose that a similar answer could be given relative to the appropriations earlier set out in this dissent, *i.e.,* they referred to "deficiency" items. If that be the logic in differentiating those acts and the present act, then I say that No. 442 only refers to "surplus" funds, which, incidentally, amount to approximately 2½% of the total appropriations of the 1961 General Assembly. To me, there is as much unity of subject and purpose in appropriating funds solely from a surplus for the benefit of various institutions, as in appropriating funds in aid of refunding for the benefit of several institutions—or in paying deficiencies. I see no difference in the constitutional question. The monies used for all these purposes are state monies, and all are paid through the State Treasury. In fact, The Majority plainly state: "Act 442 cannot be sustained on the theory that the appropriation of surplus funds to a great variety of objects constitutes a single subject within the meaning of the Constitution. The Constitution makes no exception in the case of surplus funds; it applies to *all*[1] appropriation bills." That being true, it applied to Act 223 of 1939. Since the Court held that the section did not apply there, I am convinced that it should not apply here.

For these reasons, I respectfully dissent.

SAM ROBINSON, Associate Justice, dissenting. Our present Constitution was adopted in 1874. Since that time the Legislature has passed hundreds of appropriation bills. Many times the validity of acts of the Legislature has been attacked on the ground that there was a violation of Art. 5, § 30 of the Constitution, which provides that bills other than general appropriation bills shall embrace only one subject. Never before has this Court held such an act unconstitutional because it embraced more than one subject. *Fletcher* v. *Oliver,* 25 Ark. 289 (construing

---

[1] My emphasis.

the Constitution of 1868) ; *Palmore* v. *State,* 29 Ark. 248; *Perkins* v. *DuVal,* 31 Ark. 236; *Worthen* v. *Badgett,* 32 Ark. 496; *State* v. *Sloan,* 66 Ark. 575, 53 S. W. 47; *Vincenheller* v. *Reagan,* 69 Ark. 460, 64 S. W. 278; *State* v. *Moore,* 76 Ark. 197, 88 S. W. 881; *Johnson* v. *Johnson,* 84 Ark. 307, 105 S. W. 869 ; *Urquhart* v. *State,* 180 Ark. 937, 23 S. W. 2d 963. And, although many other states have a constitutional provision similar to the one under discussion here, the appellant has cited no case from any other jurisdiction holding that any act of any legislature violates such constitutional provision. And moreover, the majority opinion in the case at bar cites no such case.

There are two well established principles of law that should prevail in the case at bar. First, the presumption of constitutionality of the Act. The law is firmly settled that acts of the Legislature are presumed to be constitutional and all doubt on the question of the constitutionality of an act should be resolved in favor of the act. In fact, before the courts should hold an act unconstitutional, the unconstitutionality of the act ought to be shown beyond a reasonable doubt, and this Court has so held. In *State* v. *Moore,* 76 Ark. 197, 88 S. W. 881, the issue was whether an act was unconstitutional because it embraced more than one subject. There Judge McCulloch said:

"The duty and power of courts to declare an act of the legislative body void because in conflict with the Constitution, either from want of constitutional power to enact it or from lack of observance of some of the forms or conditions imposed by the Constitution, is so plain and well established that we indulge in no discussion of that question at this time. It is equally well established, however, that such power should be exercised by the courts with great caution, and only when the terms of the Constitution have been plainly violated. Chief Justice Marshall, who first authoritatively announced the doctrine that courts possess such power, subsequently said: 'The question whether a law be void for its repugnancy to the Constitution is at all times a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative in a doubtful case. The court, when impelled by duty to ren-

der such a judgment, would be unworthy of its station, could it be unmindful of the solemn obligation which that station imposes; but it is not on slight implication and vague conjecture that the Legislature is to be pronounced to have transcended its powers, and its acts to be considered void. The opposition between the Constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other.' *Fletcher* v. *Peck,* 6 Cranch, 87, 3 L. Ed. 162. A similar expression is given by the same learned court in the case of *Ogden* v. *Saunders,* 12 Wheat, 213, 6 L. Ed. 606, where Mr. Justice Washington said: 'But if I could rest my opinion in favor of the constitutionality of the law on which the question arises on no other ground than this doubt so felt and acknowledged, that alone would, in my estimation, be a satisfactory indication of it. It is but a decent respect due to the wisdom, the integrity, and the patriotism of the legislative body by which any law is passed to presume in favor of its validity until its violation of the Constitution is proved beyond all reasonable doubt.' Judge Cooley, in treating the same subject, says: 'The rule of law upon this subject appears to be that, except where the Constitution has imposed limits upon the legislative power, it must be considered as practically absolute, whether it operates according to natural justice or not in any particular case. . . . . The judiciary can only arrest the execution of a statute when in conflict with the Constitution. It cannot run a race of opinions upon points of right, reason, and expediency with the lawmaking power.' Cooley's Const. Lim. (7th Ed.) p. 236. The same learned author at another place (page 255) says: 'The duty of the court to uphold a statute when the conflict between it and the Constitution is not clear, and the implication which must always exist that no violation has been intended by the Legislature, may require it in some cases, where the meaning of the Constitution is not in doubt, to lean in favor of such a construction of the statute as might not at first view seem most obvious and natural. For, as a conflict between the statute and the Constitution is not to be implied, it would seem to follow, where the meaning of the Constitution is clear, that the court, if possible, must

give the statute such a construction as will enable it to have effect.'

"The same presumption is indulged in favor of the legislative enactment with reference to the form of the statute and the constitutional prerequisites and conditions as to the subject-matter of the legislation. *Waterman* v. *Hawkins,* 75 Ark. 120; Cooley, Const. Lim. p. 195."

The second principle of law applicable here is the construction the Legislature has placed on the constitutional provision involved. Heretofore the subject of an act has been considered by the Legislature to be whatever the Legislature chooses to make the subject. In the case at bar the subject of the Act is the redistribution of excess funds accumulated under the Revenue Stabilization Act to State institutions for the betterment of those institutions and the State. In the early days of the Constitution, when many of those who had a part in its architecture were still alive and active in affairs of state, and many of whom were members of the General Assembly, the Legislature of 1899 passed an act which clearly shows that the Legislature did not give Art. 5, § 30 a narrow construction and that the Legislature considered the subject of it to be whatever the Legislature chose to make the subject. Act 135 of 1899 made the following appropriations:

"For care and repair of State House and grounds.— Arkansas Pump and Pipe Company, $180.50; Chas. T. Abeles & Co., $9; A. B. Cory, $25; Fones Bros. Hardware Co., $67.05; Arkansas Carpet and Furniture Co., $87.56.

"For postage, expressage and stationery.—Arkansas Book and Paper Company, stationery supplies, $3.25; Wilson & Webb Book and Stationery Company, stationery supplies, $324.43.

"For taxes erroneously paid into the State treasury. —A. W. Shirey, $14.48.

"For contingent expenses, Governor's office.—J. S. Whiting for examining State treasury, $200; Arthur Neill, for traveling expenses, $326; Postal Telegraph Company, for telegrams, $15.36; Western Union Telegraph Com-

pany, for telegrams, $236.35; Southwestern Telegraph and Telephone Company, for telephone messages, $18.90; Fones Bros. Hardware Company, for stove, etc., $22.10; Arkansas Carpet and Furniture Company, for picture frame, $7.15.

"For salaries of Special Judges.—Geo. Sibley, $50; J. W. Phillips, $50; T. C. Trimble, $90; T. P. McGovern, $30; J. S. Townsend, $10; John O'Neill, $10; W. H. Martin, $10; E. L. Westbrook, $10.

"To pay Chas. F. Penzel Grocer Company.—Tobacco for Confederate Home for January, February and March, 1899, $83.49.

"To pay Beal & Doyle Grocery Company.—Current expenses School for the Blind from February 15th to March 31st, 1899, three hundred and ninety-one and fifty-nine one-hundredths dollars ($391.59).

"To pay costs in suits in the Greene County Chancery Courts, $137.75.

"To pay G. H. Joslyn, four days as special judge, $40.

"To pay T. P. Atkins, seven days as special judge, $70.

"To pay C. F. Greenlee as special judge of the Monroe Circuit Court, ten days, one hundred dollars ($100).

"To pay W. S. McCain as special chancellor of the Pulaski Chancery Court, two days, twenty dollars ($20).

"To pay G. W. Norman, special chancellor of Chicot Chancery Court, one day, ten dollars ($10).

"To pay L. W. Gregg, as special judge of the Madison circuit court, one day, ten dollars ($10).

"To pay the chancellor of the Fourth Chancery District, $172.35, salary due him for the period beginning March 6th to April 1st, inclusive."

In *Ward* v. *Bailey,* 198 Ark. 27, 127 S. W. 2d 272, the validity of Act 123 of the Acts of the General Assembly for the year 1939 was challenged with the allegation that it violated Art. 5, § 30 of the Constitution by embracing more than one subject. The Act was considered an appropriation measure, the same as the one in the case at bar, and

required a majority of three-fourths of both houses of the General Assembly for passage. This Court held that it did receive such a majority. The Act provides for the payments of debts of the penitentiary, the Arkansas State Teachers College, the reimbursement of the Permanent School Fund, the Common School Fund, and authorized the purchase of Arkansas bonds. This Court held that the Act was not in violation of the Constitution.

In 11 Am. Jur., p. 699, it is said: ''The principle of contemporaneous construction may be applied to the construction given by the legislature to the constitutional provisions dealing with legislative powers and procedure. Though not conclusive, such interpretation is generally conceded as being entitled to great weight. Thus, it has been stated that contemporaneous construction of a constitutional provision by the legislature, continued and followed, is a safe guide as to its proper interpretation. Such contemporaneous construction affords a strong presumption that it rightly interprets the meaning and intention of a constitutional provision. . . . . A practical construction acquiesced in for many years, although not truly contemporaneous with the adoption of the Constitution, is frequently resorted to in interpreting its provisions and may be sufficient to demonstrate that powers conferred by a statute are not inconsistent with the provisions of the fundamental law.''

Never before has this Court held an act of the Legislature to be in violation of Art. 5, § 30 because it embraced more than one subject. I do not think it should be done in this case, and I respectfully dissent.

JIM JOHNSON, Associate Justice, dissenting. I do not agree with the majority opinion. Having served in the State Senate and thus fully realizing the disastrous effects the opinion by the majority will have on future deliberations of the Legislature, I cannot in good conscience remain silent.

Each two years the Legislature is faced with a multitude of problems pertaining to the financing of our State Government and the services rendered to our people. In

recent years these problems have been dealt with astutely by a number of able Chief Executives and literally hundreds of dedicated men who have served in the Executive Department of our Government or as members of the House of Representatives or the Senate. The enviable position occupied by Arkansas among all the States of our Union with reference to the financial stability of our State Government is a monument to this record of ability, understanding and hard work by these people. (Compare the financial stability of Arkansas to the so-called progressive states of Michigan, Massachusetts, Minnesota, and Ohio.) Now for the first time since our Constitution went into effect in 1874, the majority of this Court, in my opinion, is encroaching upon the constitutional prerogatives of the Legislature and in so doing, I am convinced that the action of the majority will come back to haunt this Court and the people of the State in the years to come.

As I see it, the majority opinion lifts out of context of the State Constitution, Article 5, Section 30, and narrowly construes this provision, whereas all precedents in this State and throughout the Nation require this Court to resolve every reasonable doubt in favor of the constitutionality of an Act of the Legislature. Hundreds of decisions could be cited but our own early case of *State* v. *Sloan*, 66 Ark. 575, 53 S. W. 47, 74 Am. St. Rep. 106, suffices to make this point. This was the decision from which the trial court quoted in sustaining Act 442 of 1961. I feel that I cannot improve on the Court's words which are as follows:

"In concluding this Opinion, I repeat that I am required to resolve all doubts in favor of the Act. I follow the course set by the Supreme Court of this State when it wrote the Sloan case, *supra*, approving Act 128 of 1899 to build a new State Capitol and a new penitentiary and for other purposes. I adopt the words of the Supreme Court when it said 'giving to the Act the benefit of all reasonable doubts as to its validity, which it is our duty to do, we hold that it is constitutional.' "

In my opinion, the majority of this Court has concluded that all reasonable doubt should be resolved against the validity of Act 442 and in doing so has fallen into error. The majority opinion has seen fit to quote the *Sloan* case, *supra,* as authority for *reversing* the trial court. I think that unquestionably it is authority for *affirming* the trial court. In that case the Court approved an appropriation Act for the building of the new State Capitol, for the purchase of new grounds for a new State Penitentiary, for the purpose of building a new State Penitentiary and for other purposes. I cannot see and do not agree that this case is a precedent for support of the majority view in the case now under consideration.

The majority also relies upon *Fletcher* v. *Oliver,* 25 Ark. 289. Again, I do not consider this case as a precedent to support the views of the majority. In *sustaining* the Act under attack in that case the Court said:

"It is the bounden duty of courts not to defeat the will of the People, expressed through their representatives in the legislative halls, unless it is clearly manifest that some vested right or provision of the Constitution has been invaded. If the validity of every law is to depend upon the mere fact that the judiciary, if they had been legislating, would not have so arranged the law, we think that the Constitutional Convention reposed more confidence in the judicial department than sound discretion would warrant."

The majority relies upon another earlier case in the history of our State *Palmore* v. *The State,* 29 Ark. 248. Once again the act of the Legislature under attack was held to be constitutional. This is what the Court then said:

"This section is not obnoxious to the constitutional objection interposed by appellant, for the act of 1871, from which this section was taken, does not conflict with sections 22, 23, Art. V, Constitution of 1868, by embracing more than one subject, and in failing to copy the law, revised or altered, entire. The constitution required singleness of subject, to prevent omnibus bills, by which various distinct schemes could be united in one bill, and the like, and the friends of separate measures be thus united to

carry through measures which, alone, could not be passed. *It was not intended to require that minute separation of subjects as is here claimed."* (Emphasis added.)

Now let us turn to a much later case cited by the majority in support of its views, *Ward* v. *Bailey,* 198 Ark. 27, 127 S. W. 2d 272. Once again the Act of the Legislature under attack was sustained as constitutional. In that case Act 223, approved March 10, 1939, was challenged on the same grounds as are alleged against the validity of Act 442 here under consideration. Section 1 of the Act then challenged set up a Board composed of the Governor, Lieutenant Governor, Attorney General, Secretary of State, Treasurer of State, State Bank Commissioner and State Comptroller, known as the State Investment Board. The Board was invested with all the powers necessary to carry out the provisions of the Act. Section 2 of the Act states:

"The primary purposes of this Act are to provide, * * *" and then goes on to provide for the retirement of "Penitentiary Funding Notes", "Outstanding Valid Penitentiary Warrants", "by the issuance of State Penitentiary Refunding Bonds". The same treatment is given to "Arkansas State Teacher Certificates of Indebtedness." It goes on to deal with "Permanent School Bonds" issued under several earlier State Acts, with "State Debt Board Notes" issued under an earlier Act and provides for the issuance of "State Permanent School Refunding Bonds." Then a provision is made "for the investment of a limited amount of funds in the State Treasury * * * for the purpose of providing additional revenues to pay the principal and interest of bonds which are now and which may hereafter be charged against the State Sinking Fund."

Sections 3, 4, 5, 6 and 7 authorizes the Board to issue the bonds, describes the character of the bonds, deals with interest rates, notice of sale and manner of sale of the bonds.

Section 8 requires that the deposit of money obtained for the bonds be credited in the State Treasury to designate funds.

Section 9 creates a "Bond Purchase Account" in the State Treasury and other accounts.

Section 10 authorizes the Board to purchase certain full faith and credit State of Arkansas Bonds and sets out the procedure for making such purchases.

Section 11 authorizes for the use of the Board 50% of the average daily State Fund balances on the records of the Treasurer of State during a certain period for investment purposes.

Section 12 provides that the interest received from Bonds in the Bond Purchase Account shall be credited to the State Sinking Fund, and all monies thus credited to the State Sinking Fund during any fiscal year in excess of the debt service requirements for such year shall be transferred, upon certification of the State Comptroller, to the excess par value bond account, et cetera.

Section 13 provides that if the "State Depository Board" finds it necessary to sell bonds in the Bond Purchase Account for the purpose of increasing the cash account in the State Treasury to meet unusual demands for such cash, then the State Depository Board would notify the State Investment Board as to the amount of cash needed. After that the State Investment Board is authorized to decide which bonds in the Bond Purchase Account shall be offered for sale, et cetera. The procedure for the sale of the bonds is then outlined.

Section 14 provides for the distribution of money received from the sale of State-owned bonds.

Section 15 requires the State Treasurer to transfer certain funds from the "Board of Penal Institutions Fund" upon certification of the State Comptroller. It also directs the State Treasurer to transfer to the State Sinking Fund $1,000.00 each month from the cigarette tax due the Arkansas State Teachers College and then it pledges these transferred funds in payment of bonds.

Section 16 directs the State Treasurer upon certification of the State Comptroller to transfer funds from the General Revenue Fund to the State Sinking Fund when

necessary to pay obligations incurred under the provisions of the Act.

Section 17 authorizes redemption of the bonds before maturity.

Section 18 appropriates $313,519.67 from the State Sinking Fund for the purpose of paying Penitentiary Funding Notes and Warrants. It designates all monies collected and paid into the State Treasury as revenues available for investment in the manner provided in the Act and it appropriates out of such revenues the sum of $4,000,000.00 for investments. It appropriates from the State Sinking Fund $5,000.00 for paying legal notices, printing and legal and incidental expenses.

Section 19 authorizes the State Investment Board to borrow money from a bank, Trust Company, or any other lending agency or from any Federal agency and to pledge the bonds or any portion thereof purchased under the provisions of this Act for such debt. Then it provides for the use of such borrowed money. This section concludes with the following: ''For the purpose of this Section there is hereby appropriated for the use of the State Investment Board the sum of $6,000,000.00.''

Section 20 is a severability clause and provides special procedure in the event of attack upon the constitutionality of the Act.

Section 21 is the emergency clause and states that the Act is necessary to meet matured and maturing obligations in order to avoid a default by the State which would jeopardize the credit of the State.

Even though this Act was assembled and arranged to meet all the various ''purposes'' outlined therein and made appropriations for the distinct purpose of redeeming Penitentiary Funding Notes and Warrants for the distinct purpose of correcting the financial situation for Ark. State Teachers College, for the distinct purpose of making investments, for the distinct purpose of paying for legal notices, printing, legal opinions, et cetera, and for the distinct purpose of using borrowed money as follows:

"Such money so borrowed shall be used to purchase bonds in the manner and of the kind and character described in said Section 10, and the bonds so purchased by the Board may be pledged as herein provided for borrowing more money with which to purchase additional bonds and such operation of borrowing money, pledging bonds as security for money borrowed and purchasing additional bonds may be repeated from time to time as in the discretion of the board may seem advisable."

Chief Justice Griffin Smith, who had served very ably as Comptroller for the State, wrote the Opinion for this Court and stated that the Act did not violate Section 30 of Article 5 of the Constitution. Thus, it is clear beyond question that singleness of appropriation and singleness of purpose are not required by Article 5, Section 30 of the Constitution.

In the *Palmore* case, *supra,* this Court said the singleness of subject requirement of the Constitution was to prohibit uniting together in one measure "various distinct schemes". Nothing was said about the Constitution prohibiting various appropriations for various purposes in one measure, just as the Legislature did in the Acts that were sustained by this Court in the *Ward* case, *supra,* and in the *Cherry* case hereinafter discussed. Act 442 cannot and should not be described by this Court as a combination of schemes. To do so, in my opinion, is an affront to the more than 100 members of the House of Representatives and Senate who passed this measure. In fact, Judge Cooley in his celebrated works, Cooley's Constitutional Limitations (6 Ed.) p. 172, in speaking of such constitutional clauses or sections as we here have under consideration said: "The general purpose of these provisions is accomplished when a law has but one *general object* . . . . To require every end and means necessary or convenient for the accomplishment of this *general object* to be provided for by a separate act relating to that alone would not only be unreasonable but would render legislation impossible."

Following the logic of Judge Cooley, I cannot escape the conclusion that Act 442 is one well designed plan to use

funds not otherwise appropriated (surplus funds) and the plan of the Act is such that money found not necessary for one purpose may be used for another, each such purpose being distinctly stated by the Legislature. I think the Legislature should be commended for its studious attention to the many agencies involved and its keen desire to meet these needs insofar as available revenues permit. I cannot understand why the majority of this Court would say that if there is a single subject in Act 442 it is limited to "money". This is a narrow approach to a broad subject and is contrary to all precedents of this Court or any other Court in the Nation which lay down the rules for construing the Constitution.

I chose to outline Act 223 of 1939 above, at length, so as to show that instead of the case of *Ward* v. *Bailey* being a precedent to sustain the majority view, it is in reality a precedent for affirming the decree of the trial court.

Also, I could review in detail the provisions of Act 11 of the Second Special Session of the Legislature in 1934 which was sustained in the case of *Cherry* v. *Leonard,* 189 Ark. 869, wherein Mr. Justice Baker, speaking for a unanimous Court, in dealing with the subject of the numerous appropriations in the Act stated:

"The writer must confess that the wording of these appropriations is such as to give trouble, but the language used as to these appropriations must be construed 'by the law of reason,' and this may be done under the same authority as we have just above cited. It certainly cannot be found harmonious with the spirit of the act to say that it was the purpose of the Legislature to create and establish dead funds. It must have been the purpose, and we so hold, that the dates fixed in the language of these appropriations, in this particular act, was intended to fix merely the amount of money appropriated out of such funds as might arise during the particular period set out in the act and that it did not intend to say, and it does not say, expressly or impliedly, that such sums of money must be used, as being appropriated for use only during that particular period. *The Legislature knew something of the financial condition of the State.*" (Emphasis added.)

I think it is sufficient for the purposes of this dissent to point out that the Act which the Court approved consisted of 55 sections, making appropriations for various purposes, requiring certain transfer of funds, amending the laws of the State pertaining to highway fuel taxes, amending the laws of the State pertaining to highway vehicle taxes, creating certain Boards and defining the powers of such Boards, creating numerous positions in certain agencies appropriating for the salaries of such employees, et cetera.

While checking the records in the Secretary of State's office relative to the vote on Senate Bill No. 8, which became the Act 11 upheld in the *Cherry* case, *supra,* I found an interesting paradox on page 120 of the Senate House Journal for the Second Extraordinary Session of 1934. Act 442 here under consideration is timid compared to the millions and millions of dollars dealt with in Act 11 of 1934.

The majority opinion cites a number of appropriations made in Act 442 and contains this language:

"The diversified purposes embraced by Act 442 are so clearly disconnected that the appellees do not even argue that the several appropriations relate to a single subject-matter if the question is to be tested by the various appropriations themselves."

Certainly I agree that if a narrow, restricted and limited construction is placed on Section 30 of Article 5 of the Constitution, each appropriation could be considered a "subject" but our Constitution itself recognizes that numerous appropriations may be contained in one appropriation Act and it authorizes the Governor to veto individual appropriations appearing in an appropriation Act without being required to veto the entire Act, Article 6, Section 17, states:

"VETOES OF ITEMS OF APPROPRIATION BILLS.—The Governor shall have power to disapprove any item or items of any bill making appropriation of money, embracing distinct items; and the part or parts of the bill approved shall be the law, and the item or items of

appropriations disapproved shall be void, unless repassed according to the rules and limitations prescribed for the passage of other bills over the executive veto.''

Mere multiplicity of appropriations certainly cannot be given as a valid reason for striking down an Act of the Legislature.

The majority opinion complains of ''* * * the fact that the determination of what constitutes surplus funds lies entirely within the discretion and control of the Legislature.'' I agree that the Legislature has this prerogative and is entitled to this prerogative in order to be able to deal with the financial problems of the State Government and this is the prerogative of the Legislature that the majority of this Court would now destroy. I would point out that the Chief Executive of this State is elected each two years, the members of the House of Representatives are elected each two years and the Senators are elected each four years. Thus the Chief Executive and the members of the Legislature are amenable to the will of the people and, in my opinion, the will of the people should control our Government and its activities and I firmly believe that this was the intention of our forebears who drafted our Constitution.

The thought of our forebears who drafted our Constitution compels me to point out that many of those able men served in the General Assembly and on this Supreme Court in the years immediately following 1874 when the Constitution was adopted. During that period of time they reflected their construction of the Constitution in the form of statutes and court decisions which have come down to us as valuable legal precedents. In my opinion, the majority of this Court in striking down Act 442 completely ignores these valuable, honored and hallowed legal precedents, and in this case voids the rule of stare decisis.

The majority opinion places a cloud upon hundreds of appropriation Acts that have been accepted without question for almost a century. It now places a definite cloud upon numerous appropriation Acts approved by the Sixty-third General Assembly, appropriation Acts upon which the Departments of this State must rely during the bien-

nium beginning July 1, 1961. What will this Court say if the Governor's Emergency Fund Appropriation Act is challenged. It indicates without any good reason that "claims against the State" is not a fit subject for one appropriation bill. The majority opinion strikes down Act 442 without in any way attempting to give the future Sessions of the Legislature a criterion by which to meet the meaning of Article 5, Section 30, of the Constitution which the majority opinion adopts. I am convinced that utter chaos and special session after special session will be required if the Legislature is left to grope in the dark in an effort to so arrange its Acts to meet the desires of the majority of this Court as expressed in its opinion. The door is left wide open for any taxpayer to attack any one of these Acts and no doubt they will be attacked. The inescapable result of the majority opinion is that this Court has constituted itself a super Legislature. In my opinion, the majority of this Court in its opinion in this case is making new law. It is attaching a meaning and intent to Article 5, Section 30, never before attached by this Court (or by any other court in this Nation construing an identical or similar constitutional provision) even though case after case involving this particular provision of the Constitution has been before the Court. It is significant that this Court has never before struck down an Act of the Legislature as violative of this provision of the Constitution. In taking the action it has chosen, I believe the majority of this Court is leading us into a legal wilderness wherein I predict we shall become lost and will be required to wander through a maze of suits to try to find our way out and back to cleared ground where we now stand.

As an immediate result of the majority action which strikes down a bill that received more than three-fourths majority vote in the Senate and House of the General Assembly and the approval of the Chief Executive of our State, $2,000,000.00 provided to supplement salaries fo classroom teachers may never be used for this purpose; $800,000.00 in aid to our municipalities will definitely be delayed and may never become available; construction needs for the State Penitentiary and the four industrial

training schools for white and colored boys and girls found necessary by the Legislature may never come about; the State at large and some community in particular will, in all probability, be denied a new vocational trade school; a library commission building is placed in jeopardy; a number of communities in this State that had looked forward to new National Guard Armories or improved Armories will be disappointed and efforts to strengthen the defensive powers of our Nation are weakened; construction for the 75 livestock shows (State, District and County) will be delayed and may be lost forever; repairs to our State Capitol which it is the duty of this State to maintain in first class condition, repairs that any citizen can determine the need for by merely looking at the building and riding in one of the dilapidated elevators, may be eliminated; State parks that have contributed so much to the economy and growth of our State will be curtailed and the clock turned back in this field; new improvements for Prairie Grove Battleground may never come about; Arkansas Post as a National Park may be lost to our State; adequate archives for the History Commission will remain a need; diagnostic clinics for cattle, swine and poultry will not be available to the people of our State; the construction of a communications system to strengthen civil defense will be delayed and may be eliminated and repairs at A. M. & N. College will be delayed and by such delay the conditions at that school will grow worse; building needs at the Sanatorium in Booneville will not be met; work in progress at the Children's Colony will be brought to a halt; the building program at the State Hospital will be halted. Jobs will be denied the unemployed of this State, people who under Act 442 would have immediate employment on the many construction projects provided. Also, certain transfers of funds necessary to meet crucial needs found to exist by the Legislature will never be made. In striking down Act 442, this Court eliminates these transfers. The very workability and stability of the Revenue Stabilization Law (the Law which is responsible for the sound and enviable financial status which the State of Arkansas enjoys) is jeopardized because Act 442 establishes the necessary reserve for keeping that vital system of handling the State's money in

effect. As I have already stated, this Act is one coordinated plan for the use of surplus funds. The mere fact that it contains a number of appropriations for various purposes does not change the one "subject" treated with in the Act, and that is "proper use and disposition of surplus funds."

I could point out even more disastrous effects of the majority's far reaching decision but this is already enough to prove that the decision not only will upset what appears to be a well-planned financial program for the next two years wherein Act 442 is but one of 141 appropriation Acts passed by the Sixty-third General Assembly, but will upset the financial stability of the State for all time to come.

For the reasons stated above, I would sustain the decree of the trial court. I am constrained to dissent to the majority opinion to the contrary with all the vigor at my command.